UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

JAVIER AMARAT, VERONICA EUGA,      )
CHRISTOPHER EUGA, MAX MARCOTTE,    )
RICHARD P. CUMMINGS, OLYVIA CRUM,  )
JAY VERCHIN, SARAH DRAPEAU,        )
ANTONIO BARRERA, LYNDSAY DEMANBEY, )
AND SAM BISHOP, and ANTONIO BARERRA, )
    Plaintiffs                   )
                                   )
v.                                 )      Civil Action No.   4:23-cv-40065
                                   )
CITY OF WORCESTER, FORMER CITY     )
MANAGER EDWARD M. AUGUSTUS, POLICE )
CHIEF STEVEN W. SARGENT SHAWN FRIGON, )
TREVIS COLEMAN, SHAWN TIVNAN, BRETT J. )
KUBIAK, BRIAN M. PISKATOR, NATHAN P. )
LAFLECHE, DAVID GREEN, LT. MICHAEL R. )
GIROUARD, SGT. DANIEL LOPOPOLO, SGT.  )
RYAN J. MAHER, LT. DAVID P. DOHERTY,  )
SGT. MICHAEL R. LOVERIN, DUY CHAO,    )
SGT. JARRET WATKINS,                  )
& JOHN DOES 1-15,                     )
    Defendants                       )
_____)

## CLASS ACTION FIRST AMENDED COMPLAINT

### INTRODUCTION

1.     As George Floyd lay on the pavement May 25, 2020 in Minneapolis, Minnesota, pleading "I can't breathe" and was suffocated under the weight of policemen kneeling on his neck and body, bystanders took video recordings of the scene on their cell phones.

2.     Those videos, documenting the officers' conduct in grisly detail from multiple angles, triggered outrage and protests across the country and the world, as well as criminal indictments for murder against four of the officers involved.

3.     At a demonstration in Worcester on the night of June 1-2, 2020, police retaliated against peaceful bystanders whose only offense was to observe – and in many cases to record – the officers' conduct. For that, plaintiffs in this action suffered gratuitous violence, false arrest and malicious prosecution on baseless criminal charges, theft or damage of cell phones, and in some cases racist slurs – all from officers under a duty to keep the peace.

4.      At no time did the speech or actions of any plaintiff, either singly or in combination with actions of others, create a reasonably perceptible threat of harm to any person or property.  All the charges were specious, and prosecutors dropped them March 19, 2021.

5.      In response to complaints about the officers' conduct the Worcester Police Department ("WPD") mounted a perfunctory whitewash of an investigation done by a biased member of its internal affairs office who had to be transferred out of the department's internal investigations unit because of his own misconduct.

6.      Because of the City of Worcester and the WPD's *de facto* policy and practice of tolerating officers' use of excessive force and their false reporting of their own conduct and that of their victims, and because the WPD and the City of Worcester refused to hold officers accountable for their blatant disregard of a person's right to record the public conduct of the public's police, by this action Plaintiffs bring claims under 42 U.S.C § 1983 under the First Amendment for violation of the right of free speech, under the Fourth Amendment for excessive force, arrest without cause, denial of medical care to injured persons in custody, and malicious prosecution; a Monell claim against the City as well as conspiracy claims against officers under both amendments; and under the common, constitutional, and statutory law of the Massachusetts for assault and battery, theft, malicious destruction of property, malicious prosecution, and violations of Article 16 of the Massachusetts Declaration of Rights and the Massachusetts Civil Rights Act, and conspiracy.

## JURISDICTION

7.      This Honorable Court has subject matter jurisdiction over the Plaintiffs' claims pursuant to 42 U.S.C. § 1983 and § 1988, The First Fourth and Fourteenth Amendments to the United States Constitution. Title 28 U.S.C. § 1331 and 28 U.S.C. § 1343 provides federal question over the federal claims and 28 U.S.C. § 1367 provides supplemental jurisdiction over state law claims.

8.      This Court has jurisdiction to issue injunctive and declaratory relief pursuant to 28 U.S.C. § 2201 and 2202 and Fed. R. Civ. P. 57 and 65.

9.      An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

10.     Plaintiff Javier Amarat ("Amarat") resides in Worcester, Worcester County, Massachusetts.

11.     Plaintiff Veronica Euga ("Mrs. Euga"), formerly known as Veronica Pasquantonio, resides in Westport, Bristol County, Massachusetts.

2

12.       Plaintiff Christopher Euga ("Mr. Euga") resides in Westport, Bristol County, Massachusetts.

13.       Plaintiff Max Marcotte ("Marcotte") resides in Worcester, Worcester County, Massachusetts.

14.       Plaintiff Richard Cummings ("Cummings") resides in Worcester, Worcester County, Massachusetts.

15.       Plaintiff Olyvia "Glynn" Crum ("Crum"), resides in Malden, Middlesex County Massachusetts.

16.       Plaintiff Jay Verchin ("Verchin") resides in Worcester, Worcester County in the Commonwealth of Massachusetts.

17.       Plaintiff Sarah Drapeau ("Drapeau") resides in Malden, Middlesex County, Massachusetts.

18.       Plaintiff Antonio Barrera ("Barrera") resides in Southbridge, Worcester County in the Commonwealth of Massachusetts.

19.       Plaintiff Sam Bishop ("Bishop") resides in Worcester, Worcester County Massachusetts.

20.       Plaintiff Lyndsey Demanbey ("Demanbey") resides in Malden, Middlesex County, Massachusetts.

21.   Defendant City of Worcester ("The City") is a duly chartered municipal corporation of the Commonwealth of Massachusetts with a place of business at 455 Main Street, Worcester, Worcester County, Massachusetts.

22.   Defendant Edward M. Augustus ("Augustus") has been the chief executive officer of the City, with the job title of City Manager, since January 7, 2014. He resides at 127 Dean Avenue, Apt. 5312, Franklin, Norfolk County, Massachusetts.

23.   Defendant Steven W. Sargent ("Chief Sargent") was at all pertinent times a duly sworn police officer and the chief of the Worcester Police Department ("WPD"). He works at the WPD, 9-11 Lincoln Street, Worcester, Worcester County, Massachusetts.

24.   Defendant Officer Shawn Frigon, ("Officer Frigon") was at all pertinent times a duly appointed and sworn Worcester police officer.   He works at the WPD, 9-11 Lincoln Street, Worcester, Worcester County, Massachusetts.

25.   Defendant Officer Trevis Coleman, ("Officer Coleman") was at all pertinent times a duly appointed and sworn Worcester police officer.   He works at the WPD, 9-11 Lincoln Street, Worcester, Worcester County, Massachusetts.

26.   Defendant Officer Shawn Tivnan, ("Officer Tivnan") was at all pertinent times a duly appointed and sworn Worcester police officer.   He works at the WPD, 9-11 Lincoln Street, Worcester, Worcester County, Massachusetts.

27.   Defendant Officer Brett J. Kubiak, ("Officer Kubiak") was at all pertinent times a duly appointed and sworn Worcester police officer.   He works at the WPD, 9-11 Lincoln Street, Worcester, Worcester County, Massachusetts.

28.   Defendant Officer Brian Piskator, ("Officer Piskator") was at all pertinent times a duly appointed and sworn Worcester police officer.   He works at the WPD, 9-11 Lincoln Street, Worcester, Worcester County, Massachusetts.

29.   Defendant Officer Nathan Lafleche, ("Officer Lafleche") was at all pertinent times a duly appointed and sworn Worcester police officer.   He works at the WPD, 9-11 Lincoln Street, Worcester, Worcester County, Massachusetts.

30.   Defendant Officer David Green, ("Officer Green") was at all pertinent times a duly appointed and sworn Worcester police officer.   He works at the WPD, 9-11 Lincoln Street, Worcester, Worcester County, Massachusetts.

31.   Defendant Lt. Michael R. Girouard, ("Lt. Girouard") was at all pertinent times a duly appointed and sworn Worcester police officer.   He works at the WPD, 9-11 Lincoln Street, Worcester, Worcester County, Massachusetts.

32.   Defendant Sgt. Daniel Lopopolo, ("Sgt. Lopopolo") was at all pertinent times a duly appointed and sworn Worcester police officer.   He works at the WPD, 9-11 Lincoln Street, Worcester, Worcester County, Massachusetts.

33.   Defendant Sgt. Ryan Maher, ("Sgt. Maher") was at all pertinent times a duly appointed and sworn Worcester police officer.   He works at the WPD, 9-11 Lincoln Street, Worcester, Worcester County, Massachusetts.

34.   Defendant Lt. David P. Doherty, ("Lt. Doherty") was at all pertinent times a duly appointed and sworn Worcester police officer.   He works at the WPD, 9-11 Lincoln Street, Worcester, Worcester County, Massachusetts.

35.   Defendant Sgt. Michael R. Loverin, ("Sgt. Loverin") was at all pertinent times a duly appointed and sworn Worcester police officer.   He works at the WPD, 9-11 Lincoln Street, Worcester, Worcester County, Massachusetts.

36.   Defendant Sgt. Jarret Watkins, ("Sgt. Watkins") was at all pertinent times a duly appointed and sworn Worcester police officer.   He works at the WPD, 9-11 Lincoln Street, Worcester, Worcester County, Massachusetts.

37.   Defendant Officer Duy Chao, ("Officer Chao") was at all pertinent times a duly appointed and sworn Worcester police officer.   He works at the WPD, 9-11 Lincoln Street, Worcester, Worcester County, Massachusetts.

38.   Defendant Officers, John Doe 1-10 ("Officer Doe 1-10") were at all pertinent times duly appointed and sworn Worcester police officers. They work at the WPD, 9-11 Lincoln Street, Worcester, Worcester County, Massachusetts.

FACTS

39.   At all pertinent times, Augustus acted and/or failed to act as the duly appointed City Manager and chief executive of the City of Worcester and the direct supervisor of Chief Sargent, empowered under state law to hire, fire, and to exercise authority over the City's police officers and to keep the peace within the City.

40.   At all pertinent times each individual defendant other than Augustus was a duly sworn police officer of the City and acted and/or failed to act in his official capacity as an officer under the law of the Commonwealth.

41.   Upon information and belief, on June 1, 2020, Chief Sargent consulted with his top commanders, Augustus, and the Massachusetts State Police ("MSP") to plan for a protest demonstration organizers had announced for that day at City Hall.

42.   Augustus and Sargent ordered activation of WPD tactical and other police units and placed them on alert.

43.   One such unit was the WPD Tactical Patrol Force Project 6 ("Project 6") under the command of Lt. David Maher, and four Sergeants, including the Defendant Sgt. Ryan Maher. Members of the unit, a total of 50 officers, were dressed in riot gear.

44.   On information and belief 28 patrolmen and 9 supervisors of the WPD Service Division donned riot gear and joined Project 6,  including the defendants Lt. Michael Girouard, Sgt. Daniel Lopopolo and Sgt. Jarret Watkins.

45.   To prepare for the demonstration the WPD also deployed the 30 members of its Special Weapons and Tactics unit, or the SWAT team, including Defendant Brian Piskator, also in riot gear and carrying an assortment of weapons including automatic 45. Cal. sidearms but at least two 5.56 mm rifles.

46.   Two members from the WPD gang unit, including Defendants Coleman and Frigon and at least three K-9 officers with dogs, were deployed as well along with Defendant Shawn Tivnan of the Tactical Patrol Force.

47.   Other than the activation and deployment of these officers the WPD did little operational planning for the demonstration, though its commanders knew that few

officers had been trained in crowd control.

48.     The City's response to a public records request shows virtually no planning or organization of the WPD chain or command to deal with the demonstration.

49.     In an email circulated May 30, Deputy Edward J. McGinn, Jr., wrote, "Please make sure all sworn staff is fully equipped in full duty belts (unless in cell room) in case we are needed to assist in the enforcement of this protest. We'll need both wagons staffed and stocked should we need them tomorrow. . . .[P]lease ask for volunteers to come in if on off duty status (OT status). In the event we get a flurry of arrests, we'll need the staff to support this and to handle the influx of people trying to bail them out."

50.     He added that Capt. Matthew D. D'Andrea would be in charge and that an, "operational plan" was in place.

51.     Besides a paucity of training in crowd control, on June 1, 2020, the WPD had a use of force policy that did not mention or otherwise address the concept of de-escalation.

52.     Only two years later, June 2, 2022 did Chief Sargent amended an existing use of force policy that defined and called for the de-escalation in use of force encounters.

53.     The 2022 amended policy describes it as "*a process which results in a decrease in intensity or magnitude of a stressful and potentially violent encounter the outcome of which reduces the possibility of increased officer use of force or subject injury.*" Policy 400 (4)(J).

54.     It was not until June 2022 that the WPD policy required formal training of officers in de-escalation of force: "*De-Escalation training shall be conducted initially at the recruit (student) officer level and annually thereafter. All officers shall participate in De-Escalation training. Officers shall be instructed on; related definitions, including a working definition of De-Escalation, appropriate verbal and non-verbal techniques to De-Escalate subject behavior, apply the principles of Time, Distance and Cover as they relate to de-escalation, and properly document in detail the subject's behavior and attempts to De-Escalate the subject's behavior when tactically feasible.*" Policy # 400 (5).

55.     Thus, none of the Defendants' (including officers or supervisors) that came in contact with the Plaintiffs' had any formalized training on de-escalating the use of force.

56.     The failure to train and the absence of any training in de-escalation of force evinces deliberate indifference to the rights of citizens.

**The City Hall Rally**

57.     On the evening of June 1, 2020, protesters gathered at City Hall for a demonstration organized by Worcester City Councilor Krystan King and marched down Main Street to the Worcester County courthouse and back to City Hall.

58.     Chief Sargent joined protesters and kneeled along with them in memory of George Floyd.



59.     The rally ended at the City Hall Commons at about  8:20 p.m., and many of the people left,  while a group of over 100 protesters  remained at the Commons.

60.     Photos during the rally revealed two WPD officers (including one employed by the crime scene services unit) took a trove of photographs of peaceful demonstrators including of a Black Worcester City counsel member and activists that spoke during the City Hall rally.

61.     Shortly after 9 p.m. protesters began to march on Main Street towards the Main South neighborhood, followed by police.

62.     As the group approached the intersection of Main and Hammond Streets, protestors carried signs, and chanted slogans such as "George Floyd," "No justice, no peace," "Black lives matter," and "No racist police."

63.     Up to this point there had been no significant conflict between demonstrators and police.

64.     As the protestors reached the corner of Main and May Streets, just before

Hammond, officers had blocked roads off and protestors had no place to walk.

65.     Some protesters sat down or lay in the street but got up and moved on after one of them led a prayer for George Floyd.



**Confrontation at Main & Hammond Street**

66.     At Hammond Street, police blocked Main Street off with a cruiser, directed the people onto Hammond and corralled them there. The crowd clogged Hammond and spilled over into an adjacent Dunkin Donuts parking lot.

67.     A large contingent of police in riot gear began closing in on protesters on Hammond Street, armed with riot batons, and they formed a barricade between Main and Hammond and quickly escalated the situation between them and protestors.





68.     Riot police began physically engaging protestors: pushing protesters located in that area as they yelled "Move, Move, Move."

69.     When protestors arrived at the intersection of Main Street, May Street and Hammond Street WPD had blocked roads off and protestors had no place to walk. www.facebook.com/watch/live/?ref=search&v=255644092445698

70.     WPD officers performed a tactic typically referred to as "Kettling" to contain protestors.

71.     Kettling is a form of riot control in which police block off streets and confine groups of people and then arrest them.



72.     When protestors moved, police retreated back and it was unclear where they wanted protestors to go.



73.     The officers in riot gear began firing hundreds of pepper spray projectiles into a crowd at the corner of Claremont and May Streets, a block north of May, even when the protestors were retreating.

74.     One of the first people arrested was Ashley Briddon, who was thrown to the ground and taken into custody by riot geared police. A video recording captured

this arrest, and a member of the WPD threatening a female protestor that if she touched the officer then Ms. Briddon would be raped.

75.     When the protestor accused the officer of behaving in a disgusting manner, the officer was asked by the female protestor to clarify what he had just said, and whether the officer was blowing kisses at her, the video appears to show the officer blowing a kiss.
https://www.dropbox.com/s/lf3pxcbrbay6ykk/June%201st.mp4?dl=0



76.     Some of the police-protester interactions were captured by a Masslive reporter who was live-streaming the protest; the reporter stated: "They are shooting stuff, shooting stuff, the police are shooting stuff… they are shooting rubber bullets . . . shooting into the crowd," and stating he could hear projectiles hitting the cars.

https://www.dropbox.com/scl/fo/u58mkiy4uiheclj8eb2md/h/2.)%20Night?dl=0&preview=MassLive-Worcester-fbdown.net.mp4&subfolder_nav_tracking=1

77.     The Masslive live stream shows hundreds of white marks or spots on the street caused by projectiles fired at protestors striking and bursting on the pavement.

78.     This prompted protesters and bystanders to retreat.

79.     Some time after the shooting began, a protester lit a bush on fire on Main Street while others began directing fireworks or flares towards the police. No Plaintiff was involved, or was ever accused of being involved, in this conduct.

80.     The weapons that the City authorized to be used against protestors and bystanders are typically referred to as kinetic weapons and Worcester had a policy entitled "Kinetic Energy Impact Projectiles Less-Lethal Shotgun Guidelines", Policy No. 400.6 effective April 13, 2007.

81.     This policy, however, only contemplated the use of a Less-Lethal Shotgun and did not contemplate the use of any other kinetic weapon launcher(s).

82.     Policy 400.6, a 15-year-old policy, has not been updated by the City despite the utilization of different launchers and munitions.

83.     Policy 400.6 specifically proscribes the following: "Random firing into crowds, firing from the hip and other deployments that do not involve a well-aimed shot are prohibited."

84.     The policy also recognized the potential for death or serious bodily injury associated with kinetic weapons and designated their use as a reportable use of force.

85.     The applicable WPD use of force policy 400, dated Aug. 10, 2018 governing the use of force that applied to this event noted that the use of Oleoresin Capsicum (OC) from a pepperball launcher or OC munitions were only applicable for a Level-Three (The resistant (active) subject and the 40mm Gas launcher (Pepperball Impact technique) was only appropriate for Level-Four (the Assaultive (Bodily Harm) subject.

86.     At all times material to this complaint, Policy 400 was silent on any matters surrounding use of force during crowd control events or social protest.

87.     Some of the projectiles were fired from Holdings (Safariland/Defense Technology) 40mm launchers with so-called "less lethal" munitions.

88.     The maker of this product Safariland LLC, (Defense Technology.com) warns this product may cause serious bodily injury or death.

89.     By way of example, a FN 303 kinetic weapon utilized by police during the Red Sox World Championship celebration was discharged  by officers and struck Victoria Snelgrove who was killed by its impact..  A Boston Police Commission found that before Ms. Snelgrove was fatally struck two other individuals  had been hit in the face by FN 303 projectiles and began bleeding.

90.     The BPD Commission  stated ". . . [w]e are unaware of any definitive independent

study addressing this question of safety, particularly the risk of penetration. The outcomes here – three shots to the head, one resulting in death and two resulting in penetration – seem inconsistent with the manufacturer's representations that the projectiles will not penetrate the skin."

91.     They also said, "[The]. . . FN 303 will remain under cloud until specific independent tests (of the sort we suggest) are conducted.  Quite apart from the other steps we recommend (such as the adoption of clear policies and adequate training), the Boston Police Department should not use this weapon until the tests are completed."

92.     The 40mm launcher is capable of firing a variety of ammunition such as chemical agents, "eXact iMpact" sponge rounds, 40mm bean bag rounds, as well as stinger (multiple rubber balls in .32, .50 and .60 caliber) rounds.

93.     The launcher is a semi automatic weapon whose velocity/energy at the muzzle is 325 feet pers second/118 foot pounds.

94.     Kinetic energy is a form of energy created by the movement of a mass as it strikes an object which is expressed in foot pounds.

95.     A foot pound is the amount of energy it takes to move one pound (mass) a distance of one foot

96.     Police also fired at bystanders and protestors alike with canisters of Safari-Smoke grenades, 40mm Safari Smoke projectiles, 40 mm of what they described in their self-serving police reports as "OC warning projectiles" and 40mm "warning" signaling projectiles.

97.     One bystander who was not arrested suffered an inch long gash in the hand when hit by a projectile.  His description of the injury was videotaped.



98.     Another bystander had visible bruises on his body that remained for and were photographed below over a week after being hit by police projectiles

  

99.     The Military-Style Maximum Smoke HC grenade from Defense Technology (Safariland) is "very toxic to aquatic life with long lasting effects" and is "suspected of causing cancer," according to the grenade's safety data sheet.

100.    One of the active components of the smoke grenade is Hexachloroethane (HC) smoke which is discharged through four (4) gas ports located on the top of the canister.

101.    The Safariland Safety Data Sheet ("SFD") for the smoke HC grenade identifies the most important symptoms and effects, both acute and delayed, as "Blast injury if mishandled, coughing, breathing difficulty."  The safety data sheet identifies a number of hazards that include, "Danger of blast or crush type injuries, among other hazards.

102.    The SFD sheets advises in regards to disposal considerations and warns this product should not be allowed to reach sewage systems. "Must not be disposed together with household garbage. Do not allow product to reach sewage system. After prior treatment product has to be disposed of in an incinerator for hazardous waste adhering to the regulations pertaining to the disposal of particularly hazardous waste. The user of this material has the responsibility to dispose of unused material, residues and containers in compliance with all relevant local, state and federal laws and regulations regarding treatment, storage and disposal for hazardous and nonhazardous wastes. Residual materials should be treated as hazardous."

103.    The health effects of hexachloroethane include nausea, vomiting, central nervous system depression, and kidney and liver damage, according 5/7/23, 2:03 PM Toxic Chemical Smoke Grenades Used in Portland to the compound's material safety data sheet. Zinc chloride, a compound released by the grenades in even greater amounts than hexachloroethane, has "long-lasting effects" on aquatic life,

according to its manufacturer's safety data sheet. The toxic compound also causes fever, chest pain, and liver damage and is associated with anorexia, fatigue and weight loss.

104.     The Safariland HC smoke grenade has  the following warning; "This product can expose you to chemicals including Lead Salts and Hexavalent Chromium, which are known to the State of California to cause cancer and Lead Salts which are known to the State of California to cause birth defects or other reproductive harm."

105.     Although the grenade's manufacturer, Defense Technology, markets it as "military style," the Department of Defense appears to have begun  phasing out the smoke bomb years ago because it was incredibly dangerous. A 1994 report of the U.S. Army Biomedical Research and Development Laboratory notes, "Exposure of unprotected soldiers tonight concentrations of HC smoke for even a few minutes has resulted in injuries and fatalities." See, Lerner S, Federal Agents Used Toxic Chemical Grenades in Portland: Portland Protesters report severe and lasting side effects from chemical weapons used during Trump's "Operation Diligent Valor." https://theintercept.com/2020/10/10/portland-tear-gas-chemical-grenades-protest

106.     A 2012 report by the Strategic Environmental Research and Development Program, the Department of Defense's environmental program, indicates that the U.S. military was at the time exploring the adoption off several less toxic "obscurants" because of the serious breathing difficult toxicities, swelling of the lungs, severe liver problems, and death associated with the grenades. The SERDP report notes that those health issues "pose a threat to the health of the war fighters that are exposed to this smoke during training and combat." Id.

107.     Police reports prepared by one of WPD training supervisors, Lt. John Bossolt states police used (4) stinger grenades, (2) sponge "X-act impact rounds" and (2) "triple chaser OC cannisters" to deliver OC spray to protestors and bystanders.

108.     By way of example, the eXact Impact Sponge round generates approximately 118 ft./Lbs of energy.

109.     A report also prepared by Lt. Bossolt, entitled "Use of Force OC Munitions, X-Act impact 40MM rounds"states: "I ordered P.O. Cahill, Kubiak, and Lugo to deploy the OC gas munitions toward the rioters in an attempt to stop their attacks. The munitions used were a "triple chaser" OC fogger cannister, designed to release OC gas in three stages for area clearing, and "stinger grenades" that release a cloud of OC while simultaneously expelling small rubber balls from the device. This was delivered toward the area where the main instigators were throwing objects that were striking the team. I delivered two "X-act impact" sponge rounds toward a male dressed in a gray hooded sweatshirt and a mask who was throwing large chunks of concrete at officers. I delivered both rounds toward the male's lower

body from a 40mm multi-launcher. The sponge projectile did not strike the male, from what I observed, due to the distance between us being too far."

110.     The specification and warnings for Stinger grenades state that, "as with any pyrotechnic device, firefighter equipment should be available. The warning of this product warns that improper use of the grenades can result in death or serious bodily injury and states the devices are, "generally reserved as a last selection" when other methods have not resolved the "disorder."

111.     By their own admission, that evening they also fired at a crowd of protesters and bystanders using 40mm eXact impact rounds made by Defense Technologies. These 40mm rounds contain a warning embedded in the projectile which states: "WARNING! DO NOT use this round at a distance closer than 40 meters in closed position as it could cause serious injury or death."

112.     40mm eXact warning/signaling munitions of OC when fired travel at speeds ranging from 145 feet per second (fps) to up to 300 fps depending on the distance. These warning/signaling munitions produce 170 dB of sound and 5 million candelas of light.

113.     The manufacturer's warnings also warns, "Do not fire directly at personnel, as serious injury or death may result."

114.     There were no legal justifications for these actions and no reasonable police officer or supervisors would have employed such an extraordinary level of force against protestors/bystanders.

### The right to record police and crowd control

115.     It was firmly established in Massachusetts and many other jurisdictions before June 1, 2020 that civilians have a right to film or record the public conduct of police as a matter of law.

116.     Nonetheless, on the night of June 1, 2020 numerous WPD officers did not recognize or observe this legal standard.

117.     Among members of the WPD it was a common assumption that strident protest was tantamount to riotous conduct that required suppression.

118.     Some of the WPD officers considered the protesters to be "anti-police" as reflected in statements on the Police Union Facebook page.

### Encounters between police and Plaintiffs

119.     Some of the plaintiffs attended the rally at City Hall and then marched with the crowd to Hammond and Main streets, but they stayed clear of any police

confrontation.

120.     Other plaintiffs who were passing by the intersection or who were drawn by the commotion from homes nearby, stayed in the area to observe.

121.     Each Plaintiff was at all times peaceful and law abiding.

### The Arrest of Javier Amarat by Officers Frigon and Coleman

122.     Amarat, who is of Hispanic descent, lived a few blocks away from the location where he was arrested in Main South.

123.     As he drove with his cousin on Loudon Street towards Main Street an officer stopped them and told them they could not drive onto Main Street.

124.     They parked on Loudon Street and approached Main Street on foot to see what was happening.

125.     Amarat was stopped on Louden Street by Officers Frigon and Coleman who work for the gang-unit.

126.     Frigon and Coleman pat-frisked Amarat, shoved him, and demanded to know the location of a "gun" they claimed he had. Amarat was not in possession of a firearm nor did he own one.

127.     After searching Amarat and finding nothing, one of the officers shoved Amarat again and told him to, "get the fuck out of here."

128.     There was no legal justification for these actions or for his pat frisk.

129.     At all pertinent times there was an unwritten and unconstitutional policy and practice of the City and the WPD that officers could stop, frisk, and search anyone with or without grounds and without reporting this conduct.

130.     This unwritten custom and practice evinced deliberate indifference to the rights of persons under the Fourth Amendment and Massachusetts constitution.

131.     Amarat then walked back to his cousin's car, took out his phone and  began to livestream onto his Facebook page.

132.     Coleman, Frigon and possibly other WPD officers followed and observed him.

133.     Amarat got in the car, and muttered the phrase "bitch ass nigga." to himself. See, https://www.youtube.com/watch?v=z0lu2szCyWo

134.     Amarat's words were not directed at Officer Coleman, who is Black, but in any

17

event  they were protected speech and the cell phone recording shows he was not disorderly or engaged in any breach of the peace.

135.   It  was clearly established law at all pertinent times that, short of threatening, Amarat's choice of words were no basis of any kind for him to be arrested.

136.   In spite of this, the officers forcefully opened the car door and violently yanked Amarat from the vehicle as he lived-streamed their conduct on Facebook and pleaded with them that he had done nothing wrong and was not resisting.

137.   Coleman later admitted under oath during a clerk-magistrate's hearing that Amarat's comment.  "[ ]…was the final straw; he was getting arrested."

138.   Amarat was forcefully thrown to the ground and handcuffed while Frigon and Coleman twisted his wrist, intentionally causing him to experience pain without any justification for doing so.

139.   Once placed on the ground, the Defendant Shawn G. Tivnan and his K-9, Mattis, a large police dog, approached Amarat as he lay handcuffed in a prone position with Frigon and Coleman on top of him and had the dog bark and snap within inches of Amarat's face.

140.   It was a violation of WPD policy for Tivnan to utilize his K-9 as a method of crowd control or to intimidate a handcuffed detainee.

141.   Coleman and Frigon arrested Amarate and took him to a WPD transport wagon on Main Street.

142.   Frigon or Coleman took Amarat's phone and instead of reporting it as required by WPD policy, one of them put Amarat's iPhone in his pocket as the phone continued recording.

143.   The phone recorded Coleman or Frigon saying, "I did that for a reason, that was Javier Amarat, he was supposed to have a gun."

144.   The live stream recording also captured statements by officers and and orders to the line of officers to, "sprint through and smash people," sounds of running and Antonio Barrera telling officers he was leaving as they closed in on Barrera and his sister Patricia.

145.   Officers are heard laughing and telling Ms. Barrera to leave the area after they had arrested her brother.

146.   Amarat's phone was never turned into evidence at the WPD or returned to him.

147.   Because his phone was not returned Amarat complained to the WPD Bureau of

Professional Standards ("BOPS") that Frigon and Coleman had stolen it.

148.    Coleman and/or Frigon took, stole, secreted, destroyed, or in some manner disposed of Amarat's phone in order to hide the evidence he had recorded.

149.    The value of the iPhone was approximately $800 (eight hundred dollars).

**The False report of Amarat's Arrest**

150.    Officer Frigon later prepared a false police report stating:  On Tuesday, June 2, 2020, I, PO Shawn Frigon was assigned to the Gang Unit, specifically to assist in the violent protest. *At approximately 0030 hours, the Tac Team was clearing individuals from Main St. While dispersing the unruly crowd, members of the Tac Team advised that three (3) individuals were running back and forth along the side and back of 906 Main St. These individuals were believed to be throwing objects such as rocks and/or glass at the numerous police officers that were on scene. Along with several other police officers on scene, I went to the rear of the building to speak with these individuals. Once at the rear of the building these three (3) individuals emerged. I asked if they lived at the building or anywhere near the property and they stated "No." They were advised to leave. While walking to their vehicle, one of the individuals was a male whom I know as Javier Amarat (DOB: (XX/XX/XX). Once at the vehicle, Amarat began yelling obscenities after he was repeatedly told to stop. His offensive conduct and disruptive shouting would have continued if not interrupted. PO Trevis Coleman and I then brought Amarat to the ground and he was placed under arrest (hand-cuffs, DL). Amarat will be charged with Disorderly Conduct and Disturbing the Peace. He was transported to the WPD via patrol wagon for booking procedures.*

151.    The cell phone recording shows that Frigon submitted a false report to justify Amarat's arrest.

152.    The WPD and City learned Frigon's report was false but did nothing to correct it or to hold Frigon or Coleman for lying.

153.    Frigon lied in his report about Amarat's conduct and allowed bogus criminal charges to be filed against him.

154.    Defendants Frigon, Tivnan and Coleman used unreasonable and excessive force against Amarat.

155.    Amarat's video was provided to the Worcester County District Attorney's Office and the Worcester Police immediately after the arrest and despite it being exculpatory they continued to pursue criminal charges knowing the allegations were false.

156.    Amarat filed motions to dismiss based upon the videos and the police reports.

157.     **Exhibit 1** is a fair and accurate copy of the WPD BOPS internal investigation regarding the Amarat complaint among others dated April 23, 2021.

158.     The assigned investigator, Sgt. Francis P. Leahy suggested Coleman and Frigon were worthy of exoneration for stealing Amarat's phone or as a result of filing a false report after glibly concluding: "*Since the video does not clearly and unambiguously show who took the phone I can not say clearly and unambiguously that PO Frigon and PO Coleman took the phone. Just because the cell phone is recording the sound of police activity doesn't mean that a police officer is in possession of it-it could have just as easily been picked up by a citizen who was following along all the action.*"

159.     In a sleight of hand, Sgt. Leahy also concluded that neither Coleman nor Frigon should be held responsible for their actions because this was a real "whodunit" "*As I mentioned above, what became of Mr. Amarat's cell phone remains a mystery and I do not know where it is today. This sergeant, however, must accept the word of the two police officers involved in his arrest as they responded in official documents because to falsify a police report is serious business and these police officers have no history of doing this. I also must add that Captain Davenport had asked both Deputy Saucier and Deputy Chief Roche to query the men in their command to check for Mr. Amarat's cell phone. The deputies informed the captain that no police officer could locate the cell phone. Perhaps, in the end, Mr. Amarat may want to petition the City for reimbursement.*"

160.     To be "exonerated" of an internal affairs complaint means, according to WPD policy, that an "Act(s) did occur but the actions of the officer were justified, lawful and proper." Worcester Police Dept. Policy and Procedure No. 500, Bureau of Professional Standards effective March 14, 2019.

161.     Neither Coleman or Frigon were interviewed by the BOPS.

162.     It was not until February of 2021 that the WPD adopted a policy of conducting face-to-face interviews with accused officers in internal investigations. But, other officers involved in the WPD response to the June 1-2, 2020 George Floyd protest were formally interviewed by the BOPS in its investigations of Plaintiffs' complaints.

163.     Instead of being interviewed Coleman and Frigon were given a set of four soft-ball questions to answer in writing.

164.     Both Coleman and Frigon denied knowing that Amarat had a phone or what happened to his phone.

165.     The City and Chief Sargent decided not to interview them because they knew their interviews would potentially inculpate them.

166.    Capt. Kenneth Davenport, commanding officer of the WPD BOPS unit testified in Jan. 24, 2022, regarding the importance of face-to-face interviews of officers accused of misconduct: "I see better efficiency in asking the questions, and if there's follow-up questions, you can go ahead and have them answered right there."

167.    Capt. Davenport noted face-to-face interviews were important because, "You can definitely look at how people react to some questions… Just to look at—to be able to look at their reactions whether it was one of hesitation, was it one of they had no problem answering the questions, it came with ease."

*168.*    And yet previously when asked why the BOPS when investigating cases of police malfeasance did not as a rule interview members of the force during investigation he replied: "*It's been a practice that has been used by that office. And in our policy it clearly states that any time—that's getting back to the chapter and section here, which talks about speaking truthfully or reporting truthfully, were bound by that law to report truthfully, we're bound by that law to report truthfully and to – with our policy and rules and regulations to be truthful.*"

169.    Coleman and Frigon were also exonerated because Sgt. Leahy's investigative conclusion that, "Since the video does not clearly and unambiguously show who took the phone I can not say clearly and unambiguously that PO Frigon and PO Coleman took the phone. Just because the cell phone is recording doesn't mean that a police officer is in possession of it—it…"

170.    The report was signed and ratified by Capt. Davenport and Chief Sargent who both agreed with the logic and soundness of the investigation.

171.    His conclusions and refusal to discipline Coleman and Frigon demonstrate deliberate indifference and the existence of a code of silence in the WPD.

172.    The Defendant City of Worcester and the WPD continued to pursue and to prosecute the charges against Amarat knowing the facts submitted by Frigon and Coleman were false.

173.    The City and the Chief knew that Frigon and Coleman lied about Amarat's conduct and thereby allowed false or inflated criminal charges to be prosecuted against him.

174.    All charges against Amarat were dismissed by the Worcester County District Attorney's Office on March 19, 2021.  See **Exhibit 2**.

175.    Amarat was harmed and experienced emotional distress.

**The arrest of Olyvia Crum**

176.     Olyvia Crum, a Clark University student living near Main Street several blocks from the location of the police-protesters confrontation, came to the scene at about 10:30 PM.

177.     She did not attend the City Hall rally or take part in the protestors' march down Main Street.

178.     Crum joined other Clark students at the scene, including Lyndsey Demanbey and Sarah Drapeau.

179.     Video recordings from that night demonstrate that at that time police had not ordered bystanders to disperse, and that Crum engaged in no disorderly conduct or breach of the peace.

180.     But she did stand on the sidewalk recording with her cell phone as police kettled protesters, blocked exits through side streets and fired kinetic weapons, including pellets that dispensed a choking pepper spray on impact.

181.     One of those pellets struck Crum in the face.

182.     Crum went back to her apartment to change out of her pepper spray covered clothing and to recharge her phone, then returned to the vicinity of Main and Louden streets at approximately 12:25AM, June 2, 2020.

183.     As Crum began recording the arrest of two people across the street from where she stood she realized they were her friends, Jay Verchin and Sarah Drapeau who had been tackled and taken into custody https://www.youtube.com/watch?v=3lyIO-7zCQo

184.     Suddenly she saw officers running towards her and in the direction of Lyndsey Demanbey, who stood nearby also recording with his phone, yelling at them to "get on the fucking ground."

185.     As officers tackled Demanbey to the pavement Crum voluntarily complied with the officers' order and laid face down on the pavement.

186.     Her phone was knocked from her hand but continued to record livestream to Facebook  from where it landed a few inches away from her.

187.     Knowing that the phone was still recording, Crum described what was happening around her.

188.     Officers told her "Don't fucking move," "Put your hands behind your fucking back" and ordered her to "stand up, stand fucking up" as they yanked her to her feet.  https://youtu.be/wvdl5irRD0

189.     Officer Green assaulted and battered Crum as she lay prone on the pavement by forcing his knee into her back, causing her agonizing pain.

190.     Crum can be heard stating, "someone has a knee on my back . . . I'm very sorry I think I'm being arrested."

191.     Green informed his colleagues he "caught one of these assholes."

192.     After Crum was handcuffed with flexi ties and brought to her feet she saw at least four officers on Demanbey punching him in the back and kicking his legs.

193.     Crum screamed and described this conduct so officers would realize she was witnessing it. See video: https://www.facebook.com/olyvia.crum/videos/4085567294794391/

194.     Crum is heard saying on livestream, "They are punching my boyfriend repeatedly in the back."

195.     Crum was walked over to the police transport wagon where an officer reached into her fanny pack, pulled out her phone charger, said "Leave it fucking here" and tossed it to the ground as she was placed in the wagon.

196.     In a police report Green fabricated evidence and falsely reported, "*Based on the abovementioned actions and observations, tactical response team members were ordered to march towards the unlawful assembled crowd and those who refused to disperse were raked (a maneuver officers are trained to utilize to bring defiant individuals towards the arrest team) by Squads 1 & 2 towards the arrest team positioned behind them. After being raked, Squad 3, was tasked with placing these subjects under arrest. Olyvia Crum (DOB: XX-XX-XX) was taken to the ground and was given several commands to stop resisting and place her hands behind her back. Crum was then secured in flexi cuffs and brought to a waiting patrol wagon for processing*."

197.     Officer Green submitted a cut-and-paste report identical to reports purportedly documenting the arrests of Lasunia Bell , Ashley Briddon,  Lyndsay Demanbey, Mrs. Euga, and Max Marcotte.

198.     The raking process described by Green did not occur.

199.     Green stated that Ms. Crum was given commands to stop resisting—but she never did and was not charged with resisting arrest.

200.     No orders to disperse were given to Crum before she was arrested.

201.     On March 5, 2021, pursuant to a response to the Plaintiffs' motion for bill of particulars, the Worcester County District Attorney Fernando Figueroa informed

Counsel that, *"Per Lt. David Doherty, all official orders to disperse were given by Operations officials on scene. The Tactical Patrol Force was requested to respond to Main and Hammond Streets at approximately 2208 hours, at which time the Tactical Patrol Lieutenant requested over the radio that dispersal orders be issued by those already on scene. The Tactical Patrol Force arrived on scene at approximately 2210 hours. At this time an Operations Lieutenant was issuing dispersal orders over a cruiser PA system parked at Main Street and Hammond Street. These orders continued for approximately five minutes with no effect before the Tactical Patrol Force began to disperse the crowd. Orders were again issued by an Operations Lieutenant via cruiser PA at approximately 2236 hours after the crowd had reassembled on Main Street This cruiser was parked on Main Street just in front of 845 Main Street facing south. Orders to disperse were again given by Operations Officials at approximately 2324 hours to a group who had again gathered in the Dunkin Donuts parking lot at 845 Main Street. Any dispersal orders given by members of the Tactical Patrol Force would have been delivered face to face with individuals in the crowd throughout the duration of the incident. The Operations Lieutenant referred to by Lt. Doherty (see above) is Lt. Michael Girouard. Lt. Girouard was issuing dispersal orders over a cruiser PA system (at approximately 2200 hours) at Main Street and Hammond Street prior to the Tactical Patrol Force arriving. Lt. Girouard gave multiple dispersal orders over the PA system at that location. Sgt. Jeffrey Carlson also gave 3 or 3 4 dispersal orders over the course of 2 hours from a cruiser PA system at Dunkin Donuts (cruiser facing south on Main St) and further south on Main St."*

202.   At no time was Crum disorderly nor did she disturb the peace or refuse any direct order to disperse from the area of Main Street at Louden Street.

203.   Crum's phone, left on the sidewalk when she was arrested, continued recording to Facebook for 10 minutes 17 seconds.

204.   The Worcester County District Attorney's Office, the WPD and BOPS were provided with copies of the video from Crum's phone.

205.   An unknown WPD officer approached Ms. Crum's phone and, as the recording shows, purposely stomped on it in retaliation for its being used to record police conduct.  See video https://www.facebook.com/olyvia.crum/videos/4085567294794391/

206.   About 30 seconds later another unknown WPD Officer returned and the video shows him gripping a fence at the location to steady himself as he deliberately stomped the phone into the pavement with his foot.

207.   On the recording a Supervisor is heard telling other officers, "I know we all want to do it but we have to hold the line."

208.   After being transported to the WPD lockup unit Crum was waiting to be booked

when she heard officers dressed in riot gear joking that they wished some of the male arrestees during the George Floyd protest placed in the "drunk tank" would have to deal with intoxicated arrestees.

209.    One of them joked how funny it would be if one of the male protesters was sexually assaulted in the drunk tank.

210.    On three separate occasions officers in riot gear opened the door to the cell where Crum was being held with other arrestees before booking, and officers leaned in to view and identify who they had arrested, pointing and saying "that one" as another officer took down their names.

211.    The officer who identified Crum as his arrestee was not the one who pinned her down beneath his knee and handcuffed her.

212.    During one of the other identifications a large officer first identified a person as his arrestee but then said "I don't fucking know, it was dark, she was brought with her loser boyfriend."

213.    Similarly to Amarat, the BOPS investigated the arrest of Ms. Crum.

214.    **Exhibit 3** is a fair and accurate copy of the WPD BOPS internal investigation regarding the Crum complaint on April 23, 2021.

215.    Investigators and Chief Sargent exonerated Officer Green for failing to comply with policy 700 (Instruction for Handling of Prisoners) and for the use of unreasonable force despite Crum's full cooperation and interview with the BOPS.

216.    Officer Green who was also not personally interviewed by Sgt. Leahy, in written answers to questions, denied seeing Crum with a phone, seeing an officer knock the phone from her hand, or anyone stomping the phone.

217.    Committed to an internal policy of exonerating every officer accused of wrongdoing Sgt. Leahy, the lead investigator, concluded Green's report was truthful and he had done nothing wrong because "*[t][t]o this sergeant, Officer Green's responses to these questions seem entirely convincing and persuasive that he had no idea what became of Ms. Crum's telephone. Indeed, it is entirely probable that Officer Green didn't even notice that Ms. Crum was recording her own arrest; even if he had, it wouldn't have mattered to him. Ms. Crum should have concentrated more on obeying the orders of the police and removing herself from a situation fraught with chaos and danger, instead of opting for melodrama and grievance.*"

218.    Consistent with this policy of exoneration Sgt. Leahy trivialized the arrest of Crum and others claiming she did not claim to be injured: "*Sgt. Avedian reported to me that Ms. Crum's booking was ordinary in so far as her demeanor was calm and*

25

*she used the telephone to call her parents. She did not claim to be sick or injured. The sergeant indicated that this was the case for eighteen other people arrested on this night, unremarkable and uneventful evening.*"

219.   Sgt. Leahy's report argued Green had not used excessive force on Crum because, *"In her words, Ms. Crum admitted that she was not struck by any police officer, whether with a baton or in any other way. To this sergeant, the force used to bring her into custody was not unnecessary."*

220.   Chief Sargent signed and ratified Leahy's report and endorsed the logic and soundness of the investigation.

221.   His conclusions and his refusal to discipline Green demonstrate deliberate indifference and corroborates the existence of a code of silence within the WPD.

222.   The Defendant City of Worcester and Officer Green continued to pursue and prosecute criminal matters against Crum knowing the facts submitted by Green and others were false.

223.   All charges against Ms. Crum were dismissed *nolle prosequi* by the Worcester County District Attorney's Office on March 19, 2021- a fact the WPD BOPS alluded to only in passing in their investigative report dated April 23, 2021. **Exhibit 2**.

224.   Green lied in his report about Crum's conduct and allowed a false and inflated criminal charge to be filed and prosecuted against her.

225.   Crum was harmed and experienced emotional distress.

**The arrest of Lyndsey Demanbey, reported 9 months later by Lt. Michael Girouard & Sgt. Ryan J. Maher**

226.   Demanbey was a Clark University student living with Crum on Norwood Street in the Main South area of Worcester.

227.   After dropping off a friend on Park Avenue he returned home and heard shouting and yelling from the corner of Main Street just yards from his house.

228.   Demanbey went to the scene at about 11 PM June 20, 2020, and as Crum and Drapeau did, began recording the protestors and police.

229.   As the videos from his phone show, Demanbey did not join the protester and was peaceful, orderly, and did not interfere with the police at all times he was present at the protest scene.

230.   Initially he observed approximately 20 protestors at that corner, but the crowd

grew when individuals came out of their homes when they heard police firing weapons.

231.    The police were firing indiscriminately at protestors, including at Demanbey and others who had been drawn by the noise and crowd and several protesters who were throwing fireworks and objects at police.

232.    Police appeared to be shooting pelletized pepperball projectiles.

233.    As police officers advanced on a group of protestors, Demanbey, Crum and Drapeau retreated and continued to record the unfolding events on their cellphones.

234.    All videos recorded by Demanbey were provided to WPD, BOPS, and the Worcester County District Attorney's Office.

235.    Demanbey's videos show that at no time was he or others near him ordered to disperse.

236.    On June 2, 2020 at approximately 12:25AM, Crum and Demanbey were at the corner of Louden Street and Main Street, a block away from their home when they observed someone across the street from them being arrested by WPD Officers.

237.    Demanbey was video recording on his phone and ran along the opposite side of the road on the sidewalk to record the arrest.

238.    At first he heard someone scream out. "HELP! HELP! I LIVE HERE!"

239.    Demanbey saw two or three officers tackling someone.

240.    Before he knew it, he observed his friend, Drapeau running and then voluntarily going to the ground before two or three officers went on top of her as well.

241.    Demanbey did not interfere with any arrest, including Drapeaus'.

242.    Demanbey was recording as he stood near Crum when he noticed officers approaching and shouting, "Get on the fucking ground. Put your fucking hands behind your back, you fucking—" and suddenly he was tackled and violently forced to the ground.

243.    A video of his arrest demonstrates Demanbey did not enter onto the roadway as police alleged. https://youtu.be/QBObKxHDrds

244.    Crum went on the ground and Demanbey did the same. He laid on his stomach, face to the ground and heard someone shout, "Get your hand out of your pocket!"

245.    Demanbey was tackled by 4 to 6 police officers, some on top of him while others pinned his head and limbs to the pavement, the officers kicked him, jammed a knee into the back of his neck, and punched him repeatedly in the back.

246.    Defendants Giourard and Maher and two unidentified members of the tactical patrol unit were among the Worcester Police officers who participated in this conduct or who witnessed it and did not intervene.

247.    The officers then dragged Demanbey to the wagon, striking him a few more times on the way.

248.    He suffered visible bruising to his face, legs, back and neck as a result of the officers' unreasonable use of force and assaultive conduct.

249.    There was no probable cause to arrest Demandbey for any crime, the officers gave him no opportunity to submit peacefully to arrest, he gave no verbal or physical sign of resistance, and the force used in his arrest was unreasonable.

250.    Demanbey suffered emotional distress as a result of actions of Worcester Police, Maher, and Girouard along with other defendants.

251.    Demanbey sees a counselor regarding his emotional distress caused by the Worcester Police, Maher, and Girouard along with other defendants on June 2, 2020.



252.    In reporting Demanbey's arrest in an incident report, Sgt. Maher and Lt. Girouard fabricated evidence and submitted a false report to support charges against him for disorderly conduct, disturbing the peace and failure to disperse.

253.    Sgt. Maher and Lt. Girouard, like other officers that night, submitted of cut-and-paste police reports similarly to those prepared by other officers in the arrests of Lasunia Bell, Ashley Briddon, Olyvia Crum, Veronica Eugo and Max Marcotte.

254.    Sgt. Maher reported: "*Based on the abovementioned actions and observations, tactical response team members were ordered to march towards the unlawful assembled crowd and those who refused to disperse were raked (a maneuver officers are trained to utilize to bring defiant individuals towards the arrest team) by Squads 1 & 2 towards the arrest team positioned behind them. After being raked, Squad 3, was tasked with placing these subjects under arrest. Lyndsay Demanbey (DOB XX/XX/XX) was among those who refused to disburse by remaining in the roadway and as such was taken into custody by the Tactical Patrol Force.*"

29

255.     The initial report prepared by Sgt. Maher/Lt. Girouard was silent as to what level of force, if any, was used by him or by others during Demanbey's arrest, nor did the report mention any other cause of injury, such as a fall.

256.     Sgt. Maher and Lt. Girouard had a duty to ascertain whether the report submitted contained fabrications and untruthful information.

257.     Sgt. Maher and Lt. Girouard made demonstrably false statements in reporting Demanbey's arrest  and allowed false criminal charge to be filed and prosecuted against him.

258.     Sgt. Maher, Lt. Girouard and every officer that assisted with Demanbey's arrest knew that the Worcester police use of force policy in existence at the time of Demanbey's arrest, or the 2018 version of Policy 400, required reporting on the use of force as follows:

A. **Any Official Police Interaction:**
    Whenever a sworn member of this department uses force in the performance of his or her duties, whether that involved an actual arrest or not, and that force is at a Level Three or higher (see Section VIII, Use of Force Model), an incident report containing a detailing of that force shall be entered into the Police Server records management system (RMS). The pointing of any authorized police tool, with the purpose of compelling subject compliance constitutes a "use of force" and as such, must be reported. As with all reports entered into the RMS system, the report shall be reviewed by a police supervisor.

B. **Arrests and Custody:**
    Whenever police force at any level (*i.e.*, Level One through Level Five inclusive) is used in the course of an arrest or other lawful detainment, a reporting thereof is required. This report shall describe the force that was used on the subject.

259.     Without faithful adherence and truthful reporting on the level of force an officer uses during an arrest the City, the Chief of Police and his chain of command had no way to monitor, oversee, and exercise control over officers use of force.

260.     This long standing custom and practice reflects deliberate indifference to the rights of citizens that come into contact with Worcester police.

261.     Demanbey was brought to the WPD lockup unit and presented at booking with obviously visible injuries described above.

262.     Demanbey was asked if he was sick or injured and he pointed to the left side of his cheek and told the booking officer and his supervisor "others than this, no." In fact, he had other injuries to other parts of his body.

263.     Despite exhibiting a visible facial injury, Demanbey was not asked if he was

alleging the use of excessive force to arrest him.

264.     The discrepancy between Demanbey's visible facial injury and Sgt. Maher's police report failing to account for injury raised no red flags and was never questioned by any of Sgt. Maher's supervisors, or anyone else in the WPD chain of command, including Chief Sargent and the WPD BOPS, which was supposed to review reports of injured prisoners for potential discrepancies.

265.     On February 27, 2021, 8-months after the arrest, Lt. Girouard submitted a false report that demonstrates the existence of a code of silence in the WPD .

266.     **Exhibit 3** is a fair and accurate copy of the WPD BOPS internal investigation report of April 5, 2021, regarding Demanbey's complaint.

267.     Lt. Girouard wrote: "*On 6-02-20 at approx 0030 hours while deployed in the area of Main and Gardner street during the on-going violent riot that were taking place. while I observed two members of the Worcester Police Swat team drive up on an individual throwing rocks and firing fire works at the tatical patrol force. The officers from the SWAT team exited the vehicle and apprehended an individual at the intersection of Main and Gardner street. While the officers were effecting the arrest I observed a male sprint across main street in the direction of the two police officers making the arrest. I then shouted out to the officers in the tactical patrol force to stop the male latter identified as Lyndsay Demanbey. Do all the noise and incoming missels being thrown and fired at the officers they were not responding. I then sprinted threw the line of officers and cut Demanbey off prior to him reaching the officers making the arrest on the side of the road. When Demanbey saw my presence between him and the two officers affecting the arrest he pivoted and started running in the opposite direction after a few steps Demanbey fell to the ground striking his face on the pavement causing a contusion to his left cheek. Demanbey also broke his glasses during the fall. When Demanbey was on the ground two officers from the tactical patrol force and Sgt. Ryan Maher and I went to the ground to place Demanby under arrest. While on the ground Demanbey placed his arms underneath his body as to resist. After a brief struggle Demanbey was handcuffed (DL). Demanbey was then escorted to the patrol wagon. While at the patrol wagon Worcester EMS briefly treated Demanbey and he was then placed inside the patrol wagon and transported to the station to be booked."*

268.     Lt. Girouard and Sgt. Maher knew or should have known that the report that he filed was false; back in June of 2020, they had not charged Demanbey with the crime of resisting arrest.

269.     The WPD and the City knew or should have known that the report of Girouard/Maher on or about February 27, 2021 and a supplemental report signed by Lt. Girouard on June 1, 2020 contained demonstrably false information.

31

270.    At no time, as shown  in the video from Demanbey's phone, did he turn and run as Girouard alleged.

271.    On Feb. 27, 2021, Lt. Girouard wrote "*When Demanbey saw my presense between him and the two officers affecting the arrest he pivoted and started running in the opposite direction after a few steps Demanbey fell to the ground striking his face on the pavement causing a contusion to his left cheek.*  This was Lt. Girouard's fabricated story, concocted long after the arrest solely to conceal the real cause of Mr. Demanbey's injuries – a public pile-on assault by Worcester police against a peaceful, law abiding, and unresisting person.

272.    Although Lt. Girouard stated in his report that Demanbey broke his glasses during the arrest, Demanbey did not wear glasses.

273.    The patent inconsistencies between Sgt. Maher and Lt. Girouard's respective police reports of Demanbey's arrest were so glaring that the BOPS decided to interview both officers.

274.    At his interview Sgt. Maher told BOPS investigators his name was associated with Demanbey's arrest report because. "following the evening's events, we were notified by the Service Division, Lieutenant Doherty and I that there were five arrestees that were brought in that didn't have officer's names attached to the arrest."

275.    Maher stated in the interview that on the night of June 1-2, 2020 Lt. Doherty was in charge of the Tactical Patrol Force and, "we decided as a team that because everything was the same with those people that were brought through the line and arrested that we would use the same language template" and Lt. Doherty ended up with three arrests (Craig, Atkinson, and Cummings) while Maher took responsibility for Lyndsay Demanbey and Max Marcotte.

276.    Although Girouard's February 27, 2021, report of Demanbey arrest stated that Sgt. Maher and two Tactical Patrol Force officers made the arrest, Sgt. Maher stated that to "the best of my knowledge I absolutely do not recall taking part in that." Shown a photograph of Demanbey, Maher stated he did not recognize him.

277.    During his interview Lt. Girouard said it was his arrest, made after Demanbey, "came across the street and attempted to interfere" [with the arrests of Jay Verchin and Sarah Drapeau.] The lieutenant said he yelled to tactical patrol force officers, " 'Don't let him get near those [arresting] officers.' With all the chaos they couldn't hear me so I jumped out in front of them and interceded . . . I put myself between Mr. Demanbey and the swat team, he saw me and then he turned the other way and started running." And at this point, he claimed, Demanbey fell to the ground and got an abrasion to the left cheek.

278.     Girouard told BOPS investigators, "My report was submitted nine-months later because one officer did the report on it and it happened to be, at the time, Sergeant Maher."

279.     Girouard also explained in his interview that, "typically in those mass arrests only one report's done. I spoke to Sergeant Maher last week and he told me what was going on and I said to him, I basically said, 'Ryan let me take a look at your report' . . "I took a look at his report and then I filed a supplemental." BPOS' Captain Davenport asked Girouard if anyone had instructed him to do his report, and he answered "No."

280.     In his report, the lead BOPS investigator, Sgt. Avedian emphasized that there was no video that showed Lt. Girouard arresting Demanbey, and he accepted at face value that Lt. Girouard denied violently throwing Demanbey to the ground despite the presence of other injuries that contradicted Girouard's version of events.

281.     Chief Sargent reviewed two BOPS investigation reports regarding Demanbey's arrest complaint, of April 5, 2021 and April 23, 2021, and signed off on statements of agreement with its logic, soundness, and conclusions.

282.     Chief Sargent exonerated that Sgt. Maher for the use of unreasonable force and found him not responsible for failing to submit a truthful report in connection with Demanbey's arrest in violation of WPD Policy 1403.1 because of a "Policy Failure."

283.     As to Lt. Girouard the chief sustained the complaint of failing to submit a report accurately and truthfully reporting the arrest of Demanbey but exonerated him from the claim of unreasonable force.

284.     Sgt. Avedian announced the reason for exonerating Sgt. Maher and Lt. Girouard of the excessive use of force by emphasizing there was "policy failure" for which no one is responsible including Chief Sargent, a policymaker of the WPD.

285.     In a follow-up report penned by BOPS investigator Sgt. Francis Lahey, he noted "*But the report really speaks to is poor planning, poor overall planning and preparation. It should never have come to be that five people could end up in police custody without anyone having any first hand, specific knowledge why. Lt. Doherty's explanation of why he and Sgt. Mahar (sic) took those arrests is valid in my opinion. The problem is, he and Sgt. Mahar should never have been put in that position for an event like this in the first instance*." Id. (WPD BOPS report of Apr. 5, 2021).

*286.*     Sgt. Lahey, similarly to Sgt. Avedian gave a number of justifications to exonerate the entire force of malfeasance and to find that "there was nothing untoward" in the officer's conduct:

*This sergeant senses a forest for the trees mentality in the thought processes pertaining to the disturbance and its aftermath. For this sergeant there is no issue with the way Lt. Doherty, the TPF, and the rest of the Worcester Police for that matter, conducted themselves while they were in the throes of chaos, violence, and the disruption of civil unrest. While I am not qualified to properly and adequately vet the training of and methods used by Lt. Doherty and his men, I take the lieutenant at his word that he and everyone assigned to him had the proper training and certifications.* **It is not for this sergeant, or this office, to be burdened with the exercise of assaying whether the training of these police officers was correct or adequate,** *or that the way the tactical response was executed was flawless or not. This function should be a training function and therefore an essential, crucial evaluation of this should be done by the Training Division; it is the members of the Training Division who train us all on the policies and procedures and rules and regulations of the Worcester Police Department. It is they who train us all in the uses of force, arresting, and handcuffing, to name but a few things they do. There was nothing untoward in the way the police behaved, notwithstanding Ms. Crum's arrest and damaged cell phone and Javier Amarat's missing cell phone. These things were the trees.*

(Emphasis added.)

287.    Sgt. Lahey's report continued

*What this sergeant sees as the forest was this: to the best of my knowledge, there was no formalized, codified Operational Plan. Yet, officially, two police officials were in charge of the response, Capt. Ryder and Lt. Doherty. A major disturbance of this size of necessity would exceed the span of control of those two. Based on what one learns from the reporting, only one other captain was present for the event, Captain D'Andrea, but it was not from him we learn this as he wrote no report. Although Lt, Michael Girouard made an arrest of a protester he is not listed as part of the command structure for this disturbance. Neither was Lt. Bossolt who had a crucial involvement in the suppression of the disorder. I do not know if the State Police were notified about our actions. No one was tasked to take notes of the action: no one was tasked to be an aide to the commander to offer advice and suggestions; there was no videography done, professionally, by the Worcester Police; not one police official who issued dispersal orders wrote an IDC indicating they did, an oversite; and there appeared to be no unified command structure that incontrovertibly and definitively established a chain-of-command. Finally, I am secure in the knowledge that a disturbance of this size and kind will happen again, especially in these times. It is of elementary and fundamental importance that a cogent and understandable working operational plan be devised and implemented when necessary."*

288.    Chief Sargent's conclusions and his refusal to discipline Sgt. Maher or Lt. Girouard or anyone else involved in the arrests of Plaintiff's or others at the protest demonstrates deliberate indifference and the existence of a code of silence.

289.     The City, the Chief and Augustus knew or should have known that Sgt. Maher and Lt. Girouard lied about Demanbey's conduct and thereby allowed false and baseless criminal charges to be prosecuted against him.

290.     All charges against Demanbey were dismissed *Nolle Prosequi* by the Worcester County District Attorney's Office on March 19, 2021. See **Exhibit 2**.

291.     Videos provided to the WPD, BOPS, the City, and the Worcester County District Attorney's Office show that Mr. Demanbey was not part of any violence.

292.     Demanbey suffered significant physical and emotional injuries.

   **The arrest of Jay Verchin (Officers Kubiak and Chao)**

293.     Videos from the protest of June 1-2. 2020 demonstrate the falsity of Lt. Girouard's statement that, "*On 6-02-20 at approx 0030 hours while deployed in the area of Main and Gardner street during the ongoing violent riot that were taking place. while I observed two members of the Worcester Police Swat team drive up on an individual throwing rocks and firing fire works at the tatical patrol force. The officers from the SWAT team exited the vehicle and apprehended an individual at the intersection of Main and Gardner street.*"

294.     The object of that falsely reported arrest was Jay Verchin.

295.     Verchin had been live streaming to Facebook from the protest scene for about 47 minutes before his arrest and video shows that at no time was he throwing rocks or shooting fireworks.See www.facebook.com/JayVerchin/videos/2813222008928633

296.     He did not participate in the protest or commit any criminal acts, contrary to claims by Lt. Girouard and Officer Kubiak, instead he was running home when Kubiak tackled and assaulted him.

297.     Defendant Chao filed a false police report stating, "*At approximately 0000hrs, I assisted P.O. Kubiak (see supp report) who was ordering a female who is later identified as Jay Verchin DOB 8-13-99 to stop. Jay ignored all the commands given to her and ran in and out of the road towards the riot team who was holding the line of defense in the intersection of Main St. and Gardner St. After a short pursuit, she was taken to the ground and secured. While P.O. Kubiak was placing her in handcuffs, a female who was later identified as Sarah Drapeau DOB 08-14-1999 and two males came running across Main St. They were given several commands to stop and get back. The two males complied with our commands and stayed across the street. The female later identified as Sarah Drapeau DOB 08-14-99 ignored all of our commands and came running towards us yelling and waving her hands. Sarah was then placed under arrest. While they were being*"

*placed under arrest, the scene was still chaotic and violent. The rioters was actively setting fires, throwing rocks, shooting fireworks and smashing business.*"

298.     Videos provided to BOPS and the Worcester County District Attorney's Office and copied from Mr. Verchin's Facebook page by WPD Detective Joseph Essex June 10, 2020, demonstrate the falsity of Chao's claims that Kubiak ordered Mr. Verchin to stop and that Verchin ignored all commands and ran in and out of the roadway towards the WPD riot team.

299.     Chao knew or should have known that the statements he filed in his report were false.

300.     The WPD, BOPS and the chain of command including Chief Sargent knew or should have known that the statements by Officer Chao were false but they failed to take corrective action.

301.     Officer Kubiak filed a false police report to WPD and the Worcester District Court in an effort to justify Verchin's false arrest and battery committed by Kubiak and other officers against Verchin .

302.     Officer Kubiak stated in his report, "*After several hours of issuing orders to disperse, a smaller contingent of protesters remained on scene and continued to throw objects at Police. I personally was struck in the head by a piece of gray concrete, but was uninjured. Several announcements were made on a WPD PA system for the crowd to disperse or they would be subject to arrest. While attempting to move the crowd further west on Main Street I observed several residents screaming to us to quell the violent disturbance and bring order to the neighborhood.  At approximately 0000 hours, I observed a female protestor, later identified as Jay Verchin DOB 08/13/1999 on the street actively ignoring orders to disperse. As I approached the J. Verchin and ordered her under arrest, she began to run towards the contingent of WPD Tactical Team holding the line of defense against the rioters. Aftera brief foot pursuit, I grabbed ahold of her and took her to the ground and secured her into handcuffs ("DL").*

303.     Kubiak knew or should have known that the report he filed contained false statements.

304.     Videos that were in the possession of the WPD supervisory staff demonstrated Mr. Verchin was not on the street actively ignoring orders to disperse.

305.     Mr. Verchin was in front of his residence when tackled and arrested by Kubiak.

306.     All charges against Mr. Verchin were dismissed by the Worcester County District Attorney's Office on March 19, 2021.

307.     There was no legal justification for the defendant's actions.

308.     Verchin was harmed and experienced anxiety and emotional distress.

**The arrest of Sarah Drapeau - POs David Green and Brett Kubiak**

309.     On June 1, 2020 Sarah Drapeau was a Clark University student living in Main South.

310.     Starting about 10:30pm she began recording the protest scene from a sidewalk along with Demanbey, Drapeau, and others.

311.     Drapeau was not a protestor and did nothing riotous or disorderly, as her cell phone video demonstrates.

312.     Videos recovered from that night demonstrate that after 10:30pm there were no dispersal orders given to Drapeau by the WPD.

313.     Ms. Drapeau was recording when she heard someone screaming and realized that police had tackled her friends Jay Verchin and Sarah Drapeau and were violently arresting them. https://www.youtube.com/watch?v=3lyIO-7zCQo

314.     She started to run across the street to record this action when an officer yelled at her to stop.

315.     Drapeau complied with the order and laid on the ground.

316.     Defendant Kubiak lied in his report that Ms. Drapeau ran across the street screaming and waving her arms.

317.     Defendant Kubiak lied in his report that Ms. Drapeau ignored his order to stop and continued to run towards him and the other officers involved in the arrest of Verchin.

318.     After Drapeau stopped running and laid down Kubiak and other officers violently pressed their knees into her back causing severe pain.

319.     She was handcuffed with flexi cuffs and arrested on charges of being disorderly, disturbing the peace, and failing to disperse during a riot.

320.     No orders to disperse were given to Drapeau before she was arrested.

321.     Drapeau did not commit any of the crimes with which she was charged.

322.     While waiting to be booked she heard officers dressed in riot gear joking that they wished some of the male arrestees during the George Floyd protest placed in the "drunk tank" would have to deal with other intoxicated arrestees.

323.     One of them joked how funny it would be if one of the male protesters was
         sexually assaulted in the drunk tank.

324.     As in the case of Amarat, the BOPS did an internal investigation into Drapeau's
         arrest and her complaint of unreasonable use of force and circumstances of her
         arrest.

325.     **Exhibit 3** is a fair and accurate copy of the WPD BOPS internal investigation
         regarding the Drapeau complaint on April 23, 2021. Investigators and Chief
         Sargent exonerated Officer Kubiak for failing to comply with policy 700
         (Instruction for Handling of Prisoners) and for the use of unreasonable force,
         despite Drapeau's full cooperation and interview with the BOPS.

326.     The report was signed and ratified by Chief Sargent who agreed with the logic and
         soundness of the investigation.

327.     His conclusions and his refusal to discipline Green demonstrate deliberate
         indifference to the civil rights of the public and tolerance at the the top of the
         WPD of a code of silence.

328.     The Defendants City of Worcester and Officer Kubiak continued to pursue and
         prosecute criminal matters against Drapeau knowing the facts submitted by
         Kubiak and others to be false.

329.     All charges against Ms. Drapeau were dismissed *nolle prosequi* by the Worcester
         County District Attorney's Office on March 19, 2021- a fact the WPD BOPS
         alluded to in passing in its investigative report of April 23, 2021. See **Exhibit 2** at
         page

330.     Green lied in his report about Drapeau's conduct and allowed  completely false
         and baseless criminal charges to be filed and prosecuted against her.

331.     Drapeau was harmed and experienced anxiety and distress.

         **Arrests of Antonio Barrera and the interactions with Patricia Barrera -
         PO Brian Piskator, John Does**

332.     Antonio Barrera and his sister Patricia Barrera were not part of any violence on
         the night of June 1, 2020 in Main South, Worcester.

333.     Mr. Barrera and Ms. Barrera were walking north on Main Street near the corner of
         Hawthorn Street and Main Street, approaching her home on Woodland Street,
         when two vans approached them from the rear and a line of officers came running
         towards them from the north.

334.    Mr. Barrera put his arms up in the air and told the officers he was going home but some of them tackled him as others grabbed his sister and shoved her to the ground.

335.    They allowed Ms. Barrera to go home, but arrested her brother on charges of disorderly conduct, disturbing the peace and failure to disperse.

336.    Officer Piskator was deployed during the protest as part of the WPD SWAT team and on information and belief he participated in and/or witnessed Barerra's arrest.

337.    Videos provided by WPD to the Worcester County District Attorney's Office show that  seconds before Mr. Barrera's arrest he was walking quietly with Ms. Barrera north on Main Street in the area of Hawthorn Street.

338.    The video showing Ms. Barrera and Mr. Barrera walking does not show any protestors or any violence taking place in the area.

339.    Mr. Barrera's phone was kicked away by the Officers during his arrest.

340.    Defendant Piskator took Mr. Barrera's phone from him but did not enter the phone into evidence or in Mr. Barrera's property. The phone was never recovered.

341.    The value of Mr. Barrera's phone was approximately $500.00.

342.    There was no legal justifications for Piskator's actions.

343.    Piskator submitted a false complaint to WPD and the Worcester District Court knowing the report to be false.

344.     Piskator wrote in his report, "*After several hours of issuing orders to disperse, a smaller contingent of protesters remained on scene and continued to throw objects at Police. Several announcements were made on a WPD PA system for the crowd to disperse or they would be subject to arrest. While attempting to move the crowd further west on Main Street I observed several residents screaming to us to quell the violent disturbance and bring order to the neighborhood. At this point my attention was drawn to a male who appeared to approach the line of police officers and then quickly run south on Main Street. I was able to stop this male later identified as Antonio Barrera (4/13/01) and conduct a take down to place Barrera into custody for unlawful assembly. Barrera was placed in handcuffs (DL) and transported to the WPD cell for via patrol wagon for booking.*"

345.    As a result of Piskator's actions he was harmed experienced anxiety and emotional distress.  He was also deprived of his property without due process.

**Max Marcotte Sgt. Ryan J. Maher, & John Does**

346.     Marcotte, a full-time student at Clark University who lived on Louden Street. On June 1, 2020 he attended the City Hall demonstration and march.

347.     After the rally he returned home and later, around midnight, heard noise from the Main Street area.

348.     Marcotte left his apartment, walked to Main Street and saw a line of police officers marching in the vicinity of Main and Norwood Streets heading south on Main Street following a smaller group of people retreating from the police.

349.     He saw officers tackle a young woman to the ground on the 900 block of Main Street and heard her scream as officers surrounded her and two of them kneeled on her back.

350.     Marcotte began to record this scene with his cell phone.

351.     Then, at about 12:30 AM at the corner of Main Street at Louden Street, Marcotte saw officers tackle Jay Verchin and approached them as he recorded this.

352.     Officers grabbed Marcotte without warning or giving him any order – then threw him to the ground with an armbar takedown maneuver.

353.     No one told him to get on the ground or told him he was under arrest.

354.     Marcotte's head struck the ground and he was injured.

355.     While on the ground his left hand and arm was underneath him and because of the weight of officers kneeling on his back he could not free his arm and put it behind his back for cuffing when ordered to do so.

356.     Officers intentionally struck Marcotte several times in the head and back.

357.     His right arm was unnaturally manipulated and his right shoulder was injured; to date it has not fully healed.

358.     An officer told him, "You're not tough any more…"

359.     Mr. Marcotte's hand and face were pushed into the paved roadway by the officers, including Sgt. Maher, causing injuries to his face, arms, torso, shoulder, back, teeth and head, and his left central incisor was chipped.

360.     The following photographs document some of visible injuries sustained by Mr. Marcotte.



361.     When Marcotte landed on the ground his phone landed on the ground inches away from his left hand.

362.     His eyeglasses were smashed from landing on the ground and/or from having his head pushed on the ground.

363.     The arresting and assisting officers in this arrest observed Marcotte recording the arrest of Jay Verchin, as he had every right to do and decided to arrest him without probable cause solely for the purpose of retaliating against him for filming the police.

364.     Worcester police records identify Sgt. Ryan Maher as the arresting officer.

365.     Sgt. Maher was part of the Worcester Police tactical patrol project 6 that consisted of Four (4) additional supervisors and Forty police officers.

366.     Sgt. Maher and the officers that assisted him with Marcotte's arrest knew he had a phone next to him but instead of collecting it, securing it as personal property and inventorying it, per WPD policy, he and the other officers purposely left it on the ground to retaliate further for his recording of police.

367.     Marcotte's phone GPS shows his phone remained from 1:09 am until 1:26 am at the same spot where he was arrested until someone picked it up and drove around the City with it until it died or was disabled.

368.     To report this arrest, Sgt. Maher used a cut and paste approach, taking language from reports of the arrests of Lasunia Bell, Ashley Briddon, Lyndsay Demanbey, Mrs. Euga and Olyvia Crum.

369.     Sgt. Maher knew or should have known that the facts he stated in his report on Marcotte's arrest contained false information.

370.     Maher and other officers involved in the Marcotte arrest were obligated to document with particularity any force they used including the take down, the arm-bar, the weight on his back, the punches and knee strikes.

*371.*     But Sgt. Maher knowingly and intentionally submitted a false and fabricated narrative report that said very little about what he and other WPD did to arrest Marcotte: "*Based on the abovementioned actions and observations, tactical response team members were ordered to march towards the unlawful assembled crowd and those who refused to disperse were raked (a maneuver officers are trained to utilize to bring defiant individuals towards the arrest team) by Squads 1 & 2 towards the arrest team positioned behind them. After being raked, Squad 3, was tasked with placing these subjects under arrest. Max Marcotte (DOB 01-03-1996) was among those who refused to disburse by remaining in the roadway and as such was taken into custody by the Tactical Patrol.*"

372.     Sgt. Maher and the other officers did not use the so-called "raking" tactic in this arrest.

373.   No orders to disperse were given by the police in the area of Louden Street and Main Street.

374.   Marcotte was arrested and charged with disorderly conduct, disturbing the peace and refusing to disperse during a riot.

375.   There was no probable cause for any of those charges because his criminal charges were fabricated.

376.   The use of force utilized by Sgt. Maher to arrest Marcotte was unreasonable.

377.   All charges against Mr. Marcotte were dismissed by the Worcester County District Attorney's Office on March 19, 2021.  **Exhibit 2**.

**Marcotte's booking**

378.   During his booking Marcotte had visible injuries, none of which were documented by Sgt. Maher in his police report as required by the WPD use of force policy.

379.   Upon information and belief, once he got to the police department, he told the booking officer and a supervising official he was injured during his arrest and he explained how they occurred.

380.   Despite the WPD having this information showing a glaring discrepancy between Maher's report of no injuries vs. Marcotte's visible injuries there was no police inquiry into how Marcotte's injuries occurred.

381.   The chain of command of the WPD, including members of the BOPS, knew Sgt. Maher's report contained false information but failed to act to correct it.

382.   Defendant Sgt. Maher and the John Does violated Marcotte's First Amendment rights by battering him and falsely arresting him in retaliation for recording the police.

383.   Sgt. Maher and John Does used unreasonable and excessive force to arrest Marcotte, and at no time did he resist or have an opportunity to submit to arrest peacefully.

384.   No reasonable officer would have used the force that Sgt. Maher and the John Does used against Marcotte.

385.   **Exhibit 1** and **Exhibit 3** are a fair and accurate copies of the WPD BOPS internal investigation reports regarding the Mr. Marcotte's arrest (and others) on April 5, 2021 and on April 23, 2021, respectively.  The investigating officer was Sgt. Avedian.

386.     Sgt. Maher was interviewed in connection with the April 5, 2021 BOPS investigative report which looked into any wrongdoing potentially committed by PO David Green, PO Shawn Frigon (as it relates to Javier Amarat), Lt. David Doherty (as it related to the arrest of Sean Patrick Craig and Taylor Atkinson) and Sgt. Ryan Maher (as related exclusively to Max Marcotte and a claim of submitting accurate and complete reports only).

387.     Although investigators and deputies had signed their conclusions in mid May 2021, Chief Sargent did not sign on the April 5, 2021 investigative report until August 6, 2021.

*388.*     The only reference to Marcotte's arrest is contained in the summary of Sgt. Avedian's report regarding narrative report prepared by Lt. Doherty: "*Sergeant Maher stated that the reason his name was put on the arrest report was "following the evening's events, we were notified by the Service Division, Lieutenant Doherty and I that there were five arrestees that were brought in that didn't have officer's names attached to the arrest."*
   *Lieutenant Doherty was in charge that evening of the Tactical Patrol Force and according to Sergeant Maher "we decided as a team that because everything was the same with those people that were brought through the line and arrested that we would use the same language template. Lieutenant Doherty ended up with three arrests (Craig, Atkinson, and Cummings) and Maher was responsible for Lyndsay Demanbey and Max Marcotte.*"

389.     The appropriateness of Marcotte's arrest or the discrepancy between Marcotte's injuries and Sgt. Maher's report were never examined or questioned by anyone.

390.     No one from the WPD BOPS reached out to Marcotte or his lawyer to interview him about the circumstances of his arrest.

391.     The investigative report written by Sgt. Leahy did inquire whether Sgt. Maher was responsible for unreasonable force vis-à-vis Marcotte's arrest and exonerated him of any such potential allegation but without referencing any individuals except with Demanbey.

392.     Chief Sargent concluded that Sgt. Maher had not violated WPD Rule 1403.1 that requires WPD to promptly, accurately and truthfully complete and submit reports as requested.

393.     Instead, he concluded by default, what he and other Chiefs of Police have done in the past when officers like Sgt. Maher violated the rules and regulations of the WPD: that the only entity to blame is a "Policy Failure."  See investigation dated April 5, 2021 signed by Chief Sargent approximately on August 6, 2021.

394.     A second parallel investigative report prepared by Sgt. Leahy from the BOPS also made reference in passing to Marcotte's arrest when he quoted a supplemental narrative report prepared by Lt. Doherty's to the BOPS: "*Ultimately / completed the arrest report encompassing the arrest of the three individuals that had already been booked under my officer code. These included Sean Pa1rick Craig, Taylor Atkinson and Richard Cummings. Sergeant Maher completed the arrest reports for the two individuals still ·waiting to be booked. These included Lindsay Demanbey and Max Marcotte.*"

395.     As stated earlier, the lead investigator, Sgt. Francis P. Leahy opined, without even mentioning Marcotte's name: "*What this sergeant sees as the forest was this: to the best of my knowledge, there was no formalized. codified Operational Plan. Yet, officially, two police officials were in charge of the response, Capt. Ryder and Lt. Doherty. A major disturbance of this size of necessity would exceed the span of control of those two. Based on what one learns from the reporting, only one other captain was present for the event, Captain D'Andrea, but it was not from him we learn this as he wrote no report. Although Lt, Michael Girouard made an arrest of a protester he is not listed as part of the command structure for this disturbance. Neither was Lt. Bossolt who had a crucial involvement in the suppression of the disorder. I do not know if the State Police were notified about our actions. No one was tasked to take notes of the action: no one was tasked to be an aide to the commander to offer advice and suggestions; there was no videography done, professionally, by the Worcester Police; not one police official who issued dispersal orders wrote an IDC indicating they did, an oversite; and there appeared to be no unified command structure that incontrovertibly and definitively established a chain-of-command. Finally, I am secure in the knowledge that a disturbance of this size and kind will happen again, especially in these times. It is of elementary and fundamental importance that a cogent and understandable working operational plan be devised and implemented when necessary.*"

396.     Just as he concluded with regards to the April 5, 2021 investigation, Chief Sargent similarly concluded that Sgt. Ryan Maher's failure to promptly, accurately and truthfully submit the reports requested, he blamed it not on Maher's fabrication of evidence but instead on an imaginary policy failure for which no one, including himself as policy maker, would be held accountable for.

397.     Chief Sargent's conclusions and his refusal to discipline Sgt. Maher and Lt. Girouard or anyone else involved in the George Floyd protests arrest for that matter demonstrates deliberate indifference and the existence of a code of silence.

398.     A few days after his arrest he saw his primary care doctor and complained of being "assaulted by police officers outside his house. Taken to the ground and hit repeatedly in the head by police. Left arm was pinned to his chest, right arm pulled behind him. Right bicep was grabbed and now has bruises there. Struck in the

head with ? elbow ? baton. Face down the whole time. Was getting hit on the back with ? batons or ? kicked."

399.     Marcotte was diagnosed with post-concussive syndrome and trauma among other medical issues.

400.     Marcotte was treated for his injuries and he suffered a concussion and a chipped tooth as a result of his assault by Sgt. Maher and other unknown officers.

401.     He continues to experience symptoms as a direct result of his unlawful and unreasonable arrest including, a chipped tooth, anxiety, stress, and pain and limitations to his range of motion on his right shoulder.

### Richard Cummings, Lt. David. P. Doherty/Sgt. Jarret Watkins & John Doe Sergeant Shawn Barbale

402.     Mr. Cummings was at the time of his arrest on June 1, 2020 a freelance photojournalist who lived in the Main South area of the City.

403.     Mr. Cummings was not part of any protest or violence on June 1, 2020.

404.     Mr. Cummings only purpose was to film the events on June 1, 2020.

405.     That evening, Cummings was located on the sidewalk of Main Street at the intersection of Main Street at Hammond Street.

406.     Mr. Cummings was filming the police actions.  He was filming close to thirty police officers who were facing southbound on Main Street.

407.     He had a First Amendment right to record the police and what was happening in the city that night.

408.     Cummings began capturing a number of incidents on his cell phone video between WPD officers and citizens, including but not limited to an individual firing fireworks into the air next to St. Peter Marian elementary school, a very small group of individuals hurling rocks at the police and an individual setting fire on a small bush in the School's retaining wall.

409.      Cummings also filmed officers rapidly shooting pepper balls towards Main Street and St. Peter elementary, aiming in the direction of protestors and bystanders standing on Main Street and the sidewalk who were not throwing anything at the police.

410.     That night Cummings was struck twice with projectiles while covering the protest, once in his left shoulder and on his right elbow.

46

411.    One of his many videos captured when an officer dressed in riot gear or tactical gear fired at a crowd congregated on Main Street, an individual fired fireworks into the air and one specifically aimed at the police line where Cummings was standing.

412.    Approximately 23 seconds into one of his videos, Cummings recorded an officer telling other officers to "…[K]eep an eye on him. I love'd to hit him with the pepper gun…" while in close proximity to a supervisor.

413.    One of Cummings video's captures Sgt. Shawn Barbale saying after he was shot with a firecracker or a flare "…[f]ucking kill the guy who just fucking shot me."

414.    Approximately 1:41 minutes into Cummings' recording, he recorded a ranked officer who approached him and asked him to ask him "why are you here." Cummings responded he was photographing and had been allowed to be there-- he was a "photographer" and was "freelancing."

415.    The supervisor captured in Cummings cell phone video was Sgt. Roger Wiseman, a supervisor with the Tactical Patrol Force Project 6.

416.    The encounter was non-confrontational and Cummings laughed and assured the ranked officer "I am not here to…." to which the ranked officer responded "Okay."
        https://drive.google.com/file/d/1rsJC5QT-xoCdrtOIJrVhFvmVnvw-Kn3o/view?usp=sharing



417.     Cummings' video shows he was not ordered to leave.

418.     The officer placed his hand on Mr. Cummings' shoulder in a friendly manner  and walked away.

419.     Approximately between 2:40 and 3:52 minutes into the cell phone recording, a group of around fifteen WPD officers dressed in riot gear, with riot batons and helmets marched and lined up in front of Mr. Cummings after being instructed by someone to stand into formation.

420.     An unknown individual, who was not arrested or criminally charged intentionally fired a firework directly at officers apparently striking them in their head and body (per police reports).

421.     Cummings continued filming WP officers dressed in riot gear from a distance of Six (6') feet away. One officer in particular appeared to not be fond of being video recorded by Cummings and shook his head in disapproval. www.oklahoman.com/embed/video/4723262001/ (Cummings arrest from Telegram & Gazette).



422.    The officer shook his head disapprovingly.

423.    Fifteen minutes later video surveillance from Worcester traffic cameras showed that as Cummings continued to record the police on the sidewalk of Main Street next to a retaining wall he was approached and arrested by three Worcester police officers. https://www.youtube.com/watch?v=jRcPjfgLn0g

424.    The three officers tackled him to the ground, force was used and they pinned Cummings against a retaining wall, his arms twisted, one officer screamed at him calling him a "faggot."

425.    An officer screamed that he would break his arms and threatening Cummings that he would be beaten by "spics" that had been arrested and were waiting to be transported with him in a police transport vehicle.

426.    One of the officers took his camera and Cummings pleaded with the officer not to break it. The officer, who pinned and screamed at him, then seized Cummings' phone.

427.    Cummings suffered a panic attack inside of the Worcester police wagon due to the actions of the officers and what had happened, his exposure to pepper spray and

his fear of contracting Covid-19 while being in a confined space without being provided a face mask.

428.   A report submitted by Lt. Doherty, who was listed as the arresting officer, fabricated evidence to falsely implicate Cummings in criminal conduct. His report stated that, "*[a]t one point the Tactical Patrol Force was holding a line across (sic) main street and Hammond Street when a Richard Cummings made his way past the front line following orders to disperse. Cummings was taken into custody by Operations officers who were holding a position at the rear of our lines.*"

429.   Cummings did not walk in front of the police line as alleged, and was standing and recording when police grabbed him from behind.

430.   Doherty, implied in his report he was the only officer involved in Cummings arrest because as a supervisor if others had arrested Cummings or assisted him with his arrest he was required to accurately report their names and what they did.

431.   City surveillance camera irrefutably shows Cummings was leaning against a wall and was not past the police front lines following orders to disperse. See, www.telegram.com/story/news/courts/2021/03/16/lawyer-concerning-videowarrants-dismissal-case-against-photographer-main-south-george-floyd-protest/6936613002/

432.   Still photographs from City surveillance cameras (controlled from the police department and the department of public works) shows Cummings was not where Lt. Doherty had claimed he was when arrested.
www.oklahoman.com/embed/video/4723262001

  

433.   Doherty lied in his report about the whereabouts of Cummings and knowingly made demonstrably false statements about Cummings' conduct. By doing so he allowed a false and inflated criminal charge to be filed against Cummings.

434.   Nine months after Cummings' arrest and prosecution, his criminal lawyers learned from discovery provided by the District Attorney office, that one of the individuals responsible for his arrest was Sgt. Jarret Watkins, a supervisor in the operations division protest roster on June 1, 2020, who had a checkered disciplinary history, had been previously sued in federal court for allegedly fracturing the skull of an arrestee, was working under a last chance agreement dating back to 2009 that

50

resulted in a 15-day work suspension authorized as punishment by the then City Manager for violating a number of rules of the WPD including, lack of truthfulness, submitting reports, and using his position as an officer to secure an unwarranted privilege for himself.

435.     It was also then that Cummings criminal lawyers learned as well (March 5, 2021) that Lt. Doherty was in charge of the TAC Team, "and Sgt. Gaumond was in charge of arrest teams and oversaw the report-writing process at the station."

436.     Cummings' cell phone was confiscated and after his phone was returned he discovered some of the videos he had recorded appeared to have been deleted.

437.     When he was booked and asked whether he was sick or injured he told police he had experienced a panic attack and that he took medication to treat.

438.     Cummings was criminally charged with disorderly conduct, disturbing the peace, rioting, and failure to disperse.

439.     Cummings was facing up to a year of jail time if convicted for failing to disperse during a riot and suffered additional distress as a result of the false charges brought against him.

440.     The criminal prosecution caused Cummings to experience significant anxiety and severe emotional distress, including physical manifestations of stress.

441.     At no time was Cummings disorderly, disturbed the peace or refused any direct order to disperse from the area of Main Street.

442.     On March 19, 2021 all charges against Cummings were dismissed *nolle prosequi* by the Worcester County District Attorney's Office. See **Exhibit 2**.

443.     In a statement, the First Assistant District Attorney Jeffrey Travers said the cases against protesters and bystanders were dropped as a result of insufficient evidence to continue prosecuting them.

444.     ADA Travers wrote, First Amendment rights are among the most fundamental Constitutional rights in a free society among other things as a justification for the dismissal.

445.     Lt. Doherty, Sgt. Watkins and John Does used unreasonable force on Mr. Cummings.

446.     There was no reason or legal justification for any of Lt. Doherty, Sgt. Watkins or the John Doe's actions.

447.    No reasonable officer or supervisor would have engaged in any of the actions they engaged in.

448.    Cummings was injured, harmed, and experienced emotional distress.

**The BOPS Investigation**

449.    On August 9, 2021, Mr. Cummings received a letter from Chief Sargent that his complaint had been investigated and it had been established that his complaint "[i]s Exonerated, that is, act(s) did occur but the actions of the officer were justified lawful and proper." Chief Sargent also notified Cummings that a, "Second Complaint" which was filed by the Bureau of Professional Standard of the Worcester Police Department on or about January 11, 2021 against an employee was investigated and it was established that "…[y]our complaint is, a Policy Failure-the allegation is true, but the P.O. was acting in a manner consistent with policy, which indicates a policy revision is required." **See Exhbit 4.**

450.    The lead investigator was Sgt. Pageau, an individual that was previously sued for violating the civil rights of a juvenile and procuring a false confession after lying to her during an interrogation following the death of her baby brother. See, e.g., Nga Truong v. Kevin Pageau, John Doherty, City of Worcester, et al, Case No. 1:12-cv-12222 Dkt. 1, (D. Mass. Nov. 30, 2012).

451.    The federal complaint alleged among other things that:

452.    The interrogation was held in a small, closed and windowless room. Nga was confronted by Pageau and Doherty, two older and much larger men who spoke with absolute authority, their tone becoming increasingly aggressive as the interrogation proceeded, yelling and using abusive language. Her requests to terminate the interrogation were denied.

453.    Pageau and Doherty falsely told Truong that they knew she killed her baby brother when she was only nine years old when they knew that the cause of his death was Sudden Infant Death Syndrome, and they mocked her when she told them the cause of his death.

454.    Pageau and Doherty supplied the scenario of Khyle's death by smothering that they wanted her to admit. They falsely stated again and again that there was medical evidence Khyle had been smothered, when they knew the cause of death had not been determined by the medical examiner, and said that only Nga could have been responsible. They also falsely described the meaning of the autopsy report. They falsely characterized Khyle as a healthy baby when in fact he had chronic medical conditions and had been ill.

455.    Pageau and Doherty falsely promised her that admitting she had smothered Khyle allow her to "get help" because she was a juvenile and confessing to the crime would allow her younger brothers to be removed from her mother's home where their care was neglected and finally Pageau and Doherty falsely promised her that she would be treated as a juvenile if she confessed to murdering her child.

456.    All criminal charges against Nga Truong were dismissed when a Worcester Superior Court Judge Kenton-Walker listened to Pageau's testimony in late 2010, she concluded that the detective was "not credible." She ruled that the detectives never gave Truong "a genuine opportunity for a meaningful consultation and suppressed the evidence.

457.    She also concluded when she ordered the confession suppressed in her decision that Detectives Kevin Pageau and John Doherty resorted to "deception regarding medical evidence" and  that neither detective offered Truong a "genuine opportunity" as required by law, to consult with a parent, before she agreed to speak with the police.

458.    When Truong sued the Pageau/Doherty the City and former Chief of Police Gary Gemme was quoted locally saying "I believe that the allegations raised (lack of probable cause and coercion) are unfounded, and that the officers will be vindicated," adding "The interrogation and arrest was validated by District Attorney Joseph Early. His decision to pursue a criminal prosecution against Ms. Truong for the death of her infant son was based, in part, on the interrogation conducted by the department." Croteau SJ Civil rights suit filed against Worcester police, Telegram & Gazette, Dec. 3, 2012. www.telegram.com/story/news/local/north/2012/12/04/civil-rights-suit-filed-against/49240493007/

459.    In June 2016 the City of Worcester agreed to pay Truong and her lawyers a settlement of $2.1 million dollars to settle her federal civil rights claims against the City.

460.    The findings by a Superior Court judge nor the $2.1M settlement mattered or hindered the career path of Kevin Pageau- shortly after he was promoted to the rank of sergeant and offered a cushy job in the WPD BOPS.

**BOPS Conclusions**

461.    Sgt. Pageau concluded: "*Mr. Cummings alleges that he was allowed to be in the area and was therefore falsely arrested. Despite Attorney Hennessey's assertion to the contrary I still do not have a video of Mr. Cummings actual arrest which is supposed to buttress his assertion that he was allowed to stay and did not make his way through police lines. Lt. Doherty's report as well as Sergeant Watkins statements indicate that Mr. Cummings did make his way through police lines after being ordered to disperse and was subsequently arrested yet it is unknown by*

*whom he was arrested since Lt. Doherty does not have firsthand knowledge of who placed Mr. Cummings under arrest. This investigation failed to discover first hand who physically placed Mr. Cummings under arrest. There is no video of his actual arrest to assist in this part of the investigation. Sergeant Watkins who was also on scene and in the area of Mr. Cummings arrest does state in his interview that Mr. Cummings did in fact cross the lines and was advised by himself and several other to leave the area. Mr. Cummings did not and was eventually placed under arrest. Sergeant Watkins does not know who arrested Mr. Cummings. As for the part of the complaint involving " .. an officer expressing a desire to kill someone ... " The officer was identified in video by Sergeant Shawn Barbale. While reviewing the video provided to me by Attorney Hennessey I did observe that on a video titled, Cummings video prior to arrest at the 5 minute and 55 second mark, and on a video titled 4912 (2) MOV at 10 minutes and 11 seconds a Tactical Team member can be overheard saying, .. . fucking kill the guy who just fucking shot me. The officer was identified as Sergeant Shawn Barbale. Sergeant Barbale was at this time still ablaze and recovering from being struck by a flaming projectile (possibly a flare) which had lit his uniform on fire, burning through his outer  garment his bullet resistant vest and his cotton under garment causing burns to his torso area. This statement does not appear to be directed at other officers or any member of the public but appears to be a visceral response to being lit on fire by rioters. On Monday June 21, 2021, I interviewed Sergeant Barbale in regard to this incident and this allegation. Just prior to being interview Sergeant Barbale along with his Union Representative, Captain Carl Supernor, viewed the video in question. Sergeant Barbale identified the person in the video as himself. He listened to the video and heard the phraseology used at the scene. He does not deny it was him or that it was him that made this statement. He does however state that if not for viewing the video he would not have and did not remember making such statements. Sergeant Barbale stated he had just talked a male off of the roof of a building in the area who also had an incendiary device (Molotov cocktail) Upon completing this action he was subsequently hit, and as stated in his interview, thought he had been shot. He looked down and observed flames. His uniform shirt, vest and cotton under shirt burned through and caused burn injuries to his upper torso. While trying to put out the fire to his clothing he did state he made an excited utterance resulting from being assaulted with an incendiary device. This statement was not directed at anyone in particular. He further stated that his statements were not directed at any other police officer or civilian and certainly not Mr. Cummings who he is unfamiliar with.*"

462.    It should be added Sgt. Pageau interviewed Lt. Doherty as part of the investigation and noted in his conclusions Lt. Doherty further stated he observed operations officers (two officers unknown who) place Mr. Cummings under arrest and further stated Sergeant Jarrett Watkins was, "right there when he was arrested".

463.    The July 15, 2021 investigation into Richard Cummings arrest was signed and ratified by Chief Sargent on August 6, 2021 who agreed with the logic and soundness of the investigation.

464.     The investigation steered clear of serious allegations: an unlawful arrest motivated by filming the police, the arrest of an individual who had cleared his presence at the scene with Sgt. Roger Wiseman, any investigation into the tampering with Cummings cell phone as well as the threats of serious physical violence against Cummings, the use of horrific homophobic and ethnic slurs during his arrest.

465.     Sgt. Pageau concluded in passing, "There is no evidence, video or audio, of this statement being made."[1]

466.     Moreover, the investigation failed to investigate whether there had been any tampering on the City's video camera which caused a freezing of the video (at 11:35p.m.) just as three officers approached Cummings, and skipped 12 minutes soon after they approached him.

467.     The City's video then continues for 2 additional minutes where an individual who appears to be a police officer standing where Cummings was last seen. See, e.g., Petrishen B,  Lawyer: 'Concerning' video warrants dismissal of case vs. Worcester man in Main South protest. March 16, 2021. www.telegram.com/story/news/courts/2021/03/16/lawyer-concerning-video-warrants-dismissal-case-against-photographer-main-south-george-floyd-protest/6936613002/

*468*.     Sgt. Pageau, well aware of the possible issue of tampering with city cameras or with the spoliation of evidence and the lack of accountability for 12 minutes of video missing and/or for the gaps in the video consulted Sgt. Bisceglia's the WPD forensic video expert and Capt. McKiernan to address Cummings lawyers concerns City cameras. The report quotes Sgt. Bisceglia responding with a non-sensical non-responsive answer: *"I have viewed the video I am aware of in regard to this case. I do not see nor can I tell just by viewing the video if any has been deleted. Is there a way to find of if ANY of Mr. Cummings video have been tampered with or deleted? If so how?  Please advise."*

469.     No efforts were made by anyone in the police department to identify any of the officers from the WPD that walked Cummings from Main Street to the back of the police transport wagon or to forensically examined the traffic cameras for tampering.

470.     Instead of investigating this issue the BOPS, its commanding officer the Chief and the City shifted the burden on Cummings to show who was responsible for his arrest.

471.     Chief Sargent exonerated Lt. Doherty of making a false report because of a policy failure for the use of unreasonable force and found him not responsible for failing to submit a truthful report As for Sgt. Barbale (Barbale is a Mass. Police Training

---

[1] Allegation 6-Mr. Cummings states he was told "spics" were going to rape him in the patrol wagon. Report at page 8.

Council Defensive Tactics Committee Instructor and Trainer), he was exonerated for saying he wanted to kill one of the individuals that hurled a firecracker or flare from conduct unbecoming.

472.     Chief Sargent's conclusions and his refusal to discipline Lt. Dougherty, Sgt. Watkins, Sgt. Barbale or anyone else involved with tampering with the City's video or the spoliation of evidence, demonstrates deliberate indifference and the existence of a code of silence in the WPD.

473.     Cummings continues to experience anxiety and as a direct result of being deprived of his constitutional rights.  He was also deprived without due process of his photojournalistic work-product.

**The arrest of Veronica Euga (formerly Pasquantonio) and Chris Euga/ PO Nathan P. Lafleche and Sgt. Daniel Lopopolo**

474.     Mrs. Euga, on June 1, 2020, was a former resident of Worcester, then living in Westport, Massachusetts, who attended the George Floyd rally in Worcester with her nephew and a friend she had in the City.

475.     She traveled with her then boyfriend and the father of her child, Christopher Euga whose family originated from the Cape Verde islands in Africa.

476.     Mrs. Euga is white.

477.     After the rally she marched with protestors into the Main South area of the city.

478.     She was walking on Main Street with friends and participants during the rally when she was attacked around 1:15 am in the 800 Block of Main Street in front of Maria's Kitchen.

479.     She and Euga were targeted by a group of police after she objected to officers shoving demonstrators.

480.     Officer LaFleche and other unknown officers ran towards her, called her a, "stupid bitch" then punched her in her forehead while two other officers punched her in the ribs.

481.     LaFleche was a member of Tactical Patrol Force Project 6 whose supervisors were Lt. Doherty, Sgt. Gaumond, Sgt. Albano, Sgt. Maher and Sgt. Wiseman.

482.     Sgt. Lopopolo was a member of the Operations division (Protest Roster 6-1-2020), who responded to a chain of command of Lt. Girouard, Lt. Francis Assad, Lt. Daniel Fallon, and Capt. John Ryder.

483.     Mrs. Euga was referred to by one of her police assailants as a, "nigger lover"

while being punched in the facial area.

484. One of her assailants told her, "Is the reason why you're here because you're a Nigger lover?"

485. Later that month the Worcester Police Union held a "Back the Blue Rally" attended by many of the officers who worked the June 1st protests. At the union event off-duty officers accosted a  small group of counter demonstrators, some calling them, "nigger lovers." and telling them that but for the police they would be raped to death by the black males whose deaths at the hands of police were the focus of their protests.

486. One of the officers who assaulted Mrs. Euga on the night of June 1, 2020, struck her in the knees and kegs with a police baton after she was backed into a corner.

487. While she was screaming in pain her boyfriend, Mr. Euga approached officers and was promptly punched in the face.

488. Mr. Euga was repeatedly punched in the face by Sgt. Lopopolo and possibly by others.

489. Mr. Euga did not at any time resist or assault police.

490. There was no legal justification for the officers' actions.

491. Sgt. Lopopolo's and that John Doe's use of force against Euga was unreasonable.

492. Worcester cops fell upon them and the end of the encounter was captured on a cell phone video. www.youtube.com/watch?v=BMjkYoscIWU

493. Mrs. Euga was brought to the ground.

494. She saw three sets of feet in front of her and had one placed on her back.

495. Mrs. Euga felt the officer's knee on her spine and they were choking her with her sweatshirt.

496. The next day her back was swollen and she had bruises and scrapes in various parts of her body.

497. Finally, Mrs. Euga was brought up from the ground and dragged to a police van.

498. She had been beaten so severely she could not stand on her own as her right knee immediately became swollen.

499. When she asked the officers who beat her up for their names and badge number they refused to provide that information. In violation of departmental policy.

500.    Both Mr. and Mrs. Euga were exercising First Amendment rights. They were not rioting or committing any crimes.

501.    LaFleche's and John Doe's use of force against Mrs. Euga were unreasonable.

502.    There was no legal justification for their actions.

503.    LaFleche fabricated evidence and falsely charged Mrs. Euga with disorderly conduct, disturbing the peace and unlawful assembly.

504.    Officer LaFleche prepared a false arrest report following the beating incident of Mrs. Euga, who is identified in the report Veronica Pasquantonio, her maiden name,

505.    In his false report he wrote "*Based on the abovementioned actions and observations, tactical response team members were ordered to march towards the unlawful assembled crowd and those who refused to disperse were raked (a maneuver officers are trained to utilize to bring defiant individuals towards the arrest team) by Squads 1 & 2 towards the arrest team positioned behind them. After being raked, Squad 3, was tasked with placing these subjects under arrest. Veronica Pasquantonio (DOB: 03-XX-XXX) was taken to the ground and was given several commands to stop resisting and place her hands behind her back. At this time, I Nathan Lafleche straddled the rear of her to prevent further kicking. Pasquantonio was then secured in handcuffs (DL) and brought to a waiting patrol wagon for processing.*"

506.    LaFleche wrote a false report knowingly.

507.    LaFleche lied in his report about Mrs. Euga's conduct and allowed a false and inflated criminal charge to be filed and prosecuted against her.

508.    He had a duty to report truthfully the level of force that he and the officers that assisted him, including punching her in the forehead, using the police baton and the names of each officer that assisted him.

509.    There was no legal justification for the officers' actions.

510.    No reasonable officer(s) would have believed their actions to be lawful.

511.    Officer LaFleche prepared an arrest report following the beating incident of Mrs. Euga.

512.    In his false report he wrote "*Based on the above mentioned actions and observations, tactical response team members were ordered to march towards the unlawful assembled crowd and those who refused to disperse were raked (a*

*maneuver officers are trained to utilize to bring defiant individuals towards the arrest team) by Squads 1 & 2 towards the arrest team positioned behind them. After being raked, Squad 3, was tasked with placing these subjects under arrest. Veronica Pasquantonio (DOB: 03-XX-XXX) was taken to the ground and was given several commands to stop resisting and place her hands behind her back. At this time, I Nathan Lafleche straddled the rear of her to prevent further kicking. Pasquantonio was then secured in handcuffs (DL) and brought to a waiting patrol wagon for processing.*"

513.     LaFleche wrote a false report knowingly.

514.     LaFleche lied in his report about Mrs. Euga's conduct and allowed a false and inflated criminal charge to be filed and prosecuted against her.

515.     No reasonable officer(s) would have believed their actions were lawful.

516.     Sgt. Lopopolo prepared an arrest report following the beating incident of Mr. Euga in which he fabricated evidence.

*517.*     In his report he wrote "*At approximately 0100 Hrs. a group of about 15 to 20 individuals were in the area of Main and King St. At that time to disperse protesters we were holding a line of officers and not allowing any further movement South on Main St. The group continued to advance towards us when we gave them verbal commands to turn around the group stopped and several in the group began demanding to be let through. I advised them several times that they were not allowed to walk further down Main St. many members of the group began yelling swearing and challenging the police to fight them. One of the members of the rioutous group was later identified as Christopher Euga. Numerous verbal commands were issued to disperse or risk being arrested the group refused to leave and continued their behavior and continued to threaten officers yelling and screaming. Other Swat and Tactical Officers were called in to move the crowd in a controlled fashion. We began to move towards the group while issuing loud verbal commands to "move back". Most of the group began to disperse walking North on Main St. Christopher Euga refused to leave despite numerous commands to and began to advance towards officers. At this time myself and other officers attempted to place Euga in handcuffs and under arrest. I ordered Euga to place his hands behind his back but he refused to do so and pulled away from us. We were eventually able to place him in handcuffs. He was transported to the station via wagon.*"

518.     Sgt. Lopopolo wrote a false report knowingly.

519.     Sgt. Lopopolo lied in his report about Mr. Euga's conduct and allowed a false criminal charge to be filed and prosecuted against him.

520.     Sgt. Lopopolo's use of force was unreasonable.

521.    There was no legal justification for the officers actions. No reasonable officer(s) would have believed their actions to be lawful.

522.    Sgt. Lopopolo fabricated evidence and charged Euga with disorderly conduct, disturbing the peace, resisting arrest, and Riot, failure to disperse.

### The booking of Mr. Euga and Mrs. Euga

523.    After their arrival to the WPD Headquarters, the Eugas were held until past 10 a.m. on June 2, 2020 for booking. Despite her requests Mrs. Euga was not allowed access to a bathroom for several hours.

524.    At their booking both Eugas were visibly injured from being battered by fists, hands and weapons and according to policy their injuries had to be documented by the booking officer and the officer in charge at the WPD lockup unit on June 2, 2020.

525.    The booking official and the official in charge of the booking room, a supervisor also learned that the reports prepared by Sgt. Lopopolo and Officer LaFleche did not match Mr. or Mrs. Euga' injuries.

526.    Mr. Euga's booking photo clearly shows he sustained two black eyes from blunt trauma to his face.

527.    Still photos extracted from his actual booking also demonstrate bruising and swelling in both eyes.  See, Id.

528.    Mr. Euga demonstrates to Sgt. Riley how his injuries occurred as he showed Sgt. Riley that he was struck by a police officer in the head during the arrest.  He told police he got hit a few times.

  

  

  

529.    This startling revelation did not raise any internal red flags or lead to any referral or request for clarification by Sgt. Riley or to the WPD BOPS.

530.    Neither Mr. nor Mrs. Euga were asked by Sgt. Riley whether they were alleging the use of unreasonable force by the arresting officers. Had they asked, both Mr. & Mrs. Euga they would have replied in the affirmative.

531.    Although she did not tell booking staff she had been punched in the forehead or about the use of racial epithets against her, Mrs Euga limped to the booking desk while visibly struggling to walk and told officers she was hit with a baton on her knee and shin.

**BOPS Conclusions**

532.   **Exhibit 5** is a fair and accurate copies of the WPD BOPS internal investigations, respectively, regarding the Mrs. & Mr. Euga's arrest.

533.   Chief Sargent notified Mr. and Mrs. Euga on August 9, 2021 "It has been established that your complaint is "Exonerated, that is, act(s) did occur but the actions of the officer were justified, lawful and proper.

534.   The investigating officer was Sgt. Avedian.

535.   Sgt. Avedian noted of the Eugas' complaints, "He [Euga] does not name or identify in any other way (Body, style, Race, Height, Weigh) who these officers may be."

536.   No one bothered interviewing Sgt. Lopopolo or Officer LaFleche to explain why, neither accounted for any injuries or why LaFleche or anyone associated with him deployed a baton and unlawfully struck Mrs. Euga with it.

537.   Instead, he and the chain of command resorted to blaming the victims for not identifying assailants who had refused to identify themselves and sishifted the burden of proof to the Eugas: "*In his complaint neither he (Attorney Hennessey) nor Ms. Pasquantonio articulate what about the report may be false beside his continuing allegation that officers cut and paste there reports. Again Ms. Pasquantonio refuses to speak with investigators in regard to this incident thwarting me from following up on these specific accusations, video and any other information she may have. In the end there is no video I am aware of that shows either Mr. Euga and /or Ms. Pasquatonio getting arrested. Mr. Euga claims he was struck by several officers, none of which he identifies. For his part Sergeant Lopopolo affected the arrest of Mr. Euga using force on a passive resistant subject during the riots/protests but denies he or any other officer struck Mr. Euga. Ms. Pasquantonio was also placed under arrest during the protests/riot she was reported to be uncooperative and actively resistant kicking officers during her arrest. In light of this her arresting officer, identified as Officer Lafleche reported using level 3 use of force to affect the arrest of Ms. Pasquantonio which he articulated in his arrest report. Neither Mr. Euga nor Ms. Pasquantonio cooperated with this investigation.*"

538.   Neither Mr. or Mrs. Euga cooperated with the investigation because they knew the investigation and the outcome would be a sham.

539.   A witness uninvolved in the protests who lived ind the area and managed a business there stated he saw police batter an individual with a police baton and was warned by officers when he started to approach for a better view, "If you take another step we will crack your fucking skull open."

540.     Chief Sargent did not sign on the July 15, 2021 investigative report until August 6, 2021; he exonerated both Lopopolo and LaFleche of the allegation of unnecessary use of force and of submitting false and untruthful reports.

541.     Chief Sargent's conclusions, acceptance of the logic of the investigation and his refusal to discipline Sgt. Lopopolo and Officer LaFleche as well as others who conspired with them to violate the rights of Mr. & Mrs. Euga is strong evidence of a flagrant climate of deliberate indifference and the existence of a code of silence in the WPD.

542.     The malicious prosecution of Mr. & Mrs. Euga came to an end when the Worcester County District Attorney's Office dismissed the false charges against March 19, 2021**.  See Exhibit 2.**

543.     Both Mrs. & Mr. Euga continue to experience sequelae from their injuries.  Mrs. Euga's knee pops from time to time.  Both experienced  anxiety as a direct result of being deprived of their constitutional rights.

### Sam Bishop

544.     Sam Bishop is and was a freelance photojournalist whose work is commonly featured in both local and national media outlets. Bishop attended the George Floyd rally on June 1, 2020  to cover it in his professional capacity, not to participate.

545.     Bishop observed that the rally at City Hall was attended by several thousand individuals, afterwards a small group of several dozen people walked from the Worcester Commons down Franklin Street and eventually onto Main Street where they began walking southward.

546.     Police at first assisted the crowd by directing traffic to allow the march to continue.

547.     When the crowd reached the intersection of Main and Hammond Streets, police blocked Main Street and began directing the crowd up Hammond Street and into the parking lot of the Dunkin Donuts shop at 845 Main Street.

548.     Soon after, the crowd began congregating in the parking lot and a number of police vans arrived  as officers dressed in riot gear quickly began to form a line across the street and sidewalk.

549.     Police eventually forced the crowd from the parking lot back onto Main Street.

550.     As police began shooting projectiles at the crowd, Bishop approached a police supervisor and showed his authorized press credentials from the National Press

Photographers Association identifying himself as a member of the media. Bishop requested permission to stay on the scene to document what was happening, and was told he could stay so long as he did not break any laws.

551.     After being given permission to stay, Bishop began walking away from the main line of riot officers to stand to the side of Main Street away from the crowd as to distinguish himself as not being part of the protest while he photographed when suddenly, after making it 75 yards away from the officers he noticed projectiles chipping the pavement around him and realized officers were firing directly at him despite him having been given permission to continue documenting the event only moments earlier and despite him standing distinctly away from any other demonstrators and despite him breaking no laws. He was struck by these rounds numerous times as well as one that left a bright, penetrating blue dye on his clothing.

552.     Bishop had a First Amendment right and a professional duty to record the police and what was happening in the city that night without fear of being targeted with assault or battery for performing lawful and constitutionally protected activities.

553.     As with the case of Cummings, officers did not want to be filmed or photographed that night in the course of their duties, whether by members of the media or by individuals with the public. It was only after Mr. Bishop identified himself as a journalist that he found himself under a barrage of rapid fire from projectiles shot by police as part of a deliberate and retaliatory attempt to use military grade weapons in order to prevent members of the media from being able to perform their duties of documenting the protest as representatives of the free press. An act that if allowed to go unaccounted for would send a chilling precedent in a functioning democracy.

554.     As police began to shoot gas canisters Bishop found himself in close proximity to the canisters and began to have trouble breathing after being exposed to the chemical agents, retching when he tried to inhale, with his face and eyes suffering from a burning sensation, his throat was soon swollen and his vision blurred.

555.     He developed scarring on his face from burns caused by exposure to the chemical agents.

 

 

556.    Bishop witnessed and photographed police projectiles smash through and cause damage to a sign for Happy House Chinese Restaurant, a local business located on 872 Main Street.



557.    Bishop witnessed police surrounding and arresting a group of demonstrators and then forcibly arresting the remaining individuals on Main Street.

558.    While walking up the street Bishop noticed around the vicinity of 900-918 Main Street an iPhone with the camera record app open laying upright on the ground in an area of the yard near a porch. A neighbor told him the phone belonged to the homeowner who had been dragged off the porch by police, and the neighbor asked Bishop to leave the phone in the mailbox, which he did.

559.    Bishop witnessed police charge a small group of people and grab at least of two of them who had begun dancing after someone in the group began playing a recording of a song entitled, "Fuck The Police" on a phone.

560.    Returning to the downtown area Bishop encountered a small group including a man who complained of being attacked by a police dog, showing what appeared to be bite wounds on his hand.

561.    He also observed and photographed other individuals that appeared to have sustained injuries as a result of the unreasonable use of force by police.

562.     The scarring and redness lasted for close to a month. Bishop also experienced anxiety and loss of income because he declined to cover other similar protests after the events near Clark University out of fear of being brutalized or again facing bodily injuries.

## Policy of the City of Worcester and Mr. Augustus and Chief Sargent

563.     At all pertinent times the City of Worcester, Chief Sargent and Mr. Augustus observed a policy, custom, and practice in the Worcester Police Department that allowed officers, including all defendants in this case and others to employ unreasonable force, violate civil rights and engage in misconduct.

564.     At all pertinent times the said parties observed a policy, custom, and practice of failing to discipline officers who violated the rights of citizens.

565.     The WPD Bureau of Professional Standards ("BPS") in charge of investigating violations to the policies and procedures of the police department, including those on excessive force, invariably credited police testimony over civilian testimony.

566.     The BOPS largely and often ignored credible allegations and evidence of police misconduct.

567.     The WPD rarely, if ever, affirmed or sustained citizen complaints of unreasonable force by members of the WPD.

568.     In the lion's share of investigations in which citizens alleged unreasonable force the officers were exceptionally cleared of any wrongdoing.

569.     The internal investigatory process and practices of the WPD do not comply with acceptable and professional police practices.

570.     By way of example, up until very recently, the BOPS investigatory policy allowed police officers accused of wrongdoing to submit written statements without participating in in-person interviews, while complainants were subject to adversarial interrogation by WPD officers.

571.     The net effect of this faulty deliberative investigatory policy resulted in automatically clearing officers of excessive force complaints where complainants would not submit to personal interrogation, even when criminal charges were pending against them.

572.     Acceptable investigatory practices require, except in cases of minor procedural violations, that all interviews of police officers accused of violations to the WPD policies and procedures should be conducted in person, that they be recorded and transcribed.

573.   Without in person interviews of officers accused of misconduct the City and police administrators cut off an important investigatory avenue to collect all relevant facts.

574.   Up until very recently the policy that allows investigations to proceed without requiring in person interview of officers allowed officers investigated of misconduct to generate vague, perfunctory use of force reports or injured prisoner reports conveying an impression of oversight while the reports in fact did not enable substantive review of officers' conduct by police administrators.

575.   These policies, customs or practices led police officers including the defendants in this case and others to believe that they could violate the rights of citizens with impunity because they knew they would not be disciplined.

576.   Upon information and belief, despite its written policy the City of Worcester, the Chief and Mr. Augustus permitted an unconstitutional policy, custom and practice that allowed the unreasonable use of police K-9 dogs, and other instances of excessive force to go unpunished.

577.   The City of Worcester, the Chief and Mr. Augustus failed to adequately train, supervise, control, monitor and discipline officers, including all defendants in this case.

578.   Upon information and belief, the City of Worcester, the Chief and Mr. Augustus failed to track or to require tracking of canine deployments and canine apprehensions and other incidents involving unreasonable force and failed to regularly evaluate such incidents and injuries arising therefrom so as to properly assess and control its canine unit and individual canine teams.

579.   The City of Worcester, the Chief and Mr. Augustus knew at all pertinent times that canine bites cause serious injuries and that there was an obvious need to train both handlers and canines to assure the appropriate use of force, and that failure caused violations of the rights of citizens who came in contact with WPD K-9's.

580.   The City of Worcester, the Chief and Mr. Augustus failed to provide for and require training of officers, including all defendants in this case in the proper use of force.

581.   At all times pertinent hereto the City of Worcester, the Chief and Mr. Augustus observed a policy, custom, and usage of failing to exercise discipline and control over the use of force by police officers, demonstrating deliberate indifference to the rights and safety of citizens.

582.   The aforesaid policy, custom and usage allowed officers to operate in the field with little supervision and without effective monitoring and at all times pertinent hereto the defendants and other police officers were aware that this was the case

**A policy of police impunity regarding unreasonable force and duplicity**

583.      In June of 2020 Worcester police had little reason to believe that the chain of command above them was serious about monitoring their uses of force or in holding them accountable for honest reporting and any use of excessive force.

584.      The failures of the City of Worcester, the Chief, Mr. Augustus, and his predecessors to monitor and control officers' use of force was readily apparent from the results of past citizen complaints to the WPD claiming excessive force.

585.      By way of example and not limitation both Sargent and Augustus knew of the following disturbing cases and failed to fire or discipline officers they knew deserved to be booted out of the WPD.

586.      Both knew of the case of Officer Rodrigo Olivera who seriously assaulted a 15-year-old mentally ill handcuffed boy at a local clinic who was being transported for a psychiatric assessment to a local hospital.

587.      The complaint was sustained only because it was witnessed by a clinician and the forty-day suspension memorialized in a last chance agreement trivialized the fact that the officer had been found to use excessive force and been untruthful.

588.      No criminal charges were brought against Officer Oliveira for punching a handcuffed teenager.

589.      Both knew of the case of Officer Ryan Joyal who on or about July 21, 2020 was videotaped by a civilian repeatedly striking a restrained mentally ill individual strapped to a gurney while being transported by police and ambulance personnel for a psychiatric exam at local hospital.

590.      Both knew Joyal lied in his police report by failing to disclose that he assaulted a restrained individual in his initial report.

591.      Both knew he was forced to correct the next day his police report, only to report it as "an open hand distraction," a cop euphemism for an assault and battery.

592.      Joyal was not tagged or disciplined for excessive force or even for filing a false report. Instead, he was given a slap on the wrist, a less than a week suspension not even for filing a false report but rather for "failure to report use of force."

593.      In any event, Joyal's brief slap on the wrist suspension resulted in a mini-police insurrection when 14 to 15 fellow officers who worked his shift decided to call in sick on the day Joyal was supposed to begin his suspension to protest his toothless punishment.

594.     No one has been disciplined for this episode.

595.     Both knew the case of Officer James J. D'Andrea, a connected cop who got a 60-day work suspension for driving drunk, crashing his car, leaving the scene of an accident and lying about the circumstances of the incident, alleging, "a deer had run in front of his pick-up truck," a story no one believed.

596.     Both knew of another case in which, a statement of facts from a Worcester County District Court alleged and charged a Worcester cop with a home invasion after he, "climbed into the home breaking a couple of blinds while doing so" and assaulting the male companion of his ex-wife.

597.     That event resulted in a 60-day work suspension signed by Augustus and former Chief of Police Gemme.

598.     Other cases for which no discipline was meted involve *Beshai et al, v. Alers, et al*, Case No. 4:20-cv-401157-TSH, Dkt. 18-1, (D. Mass. March 17, 2021)(involving the arrest and injury of a 10-year-old autistic boy who underwent surgery- an open reduction/internal fixation of the right medial epicondyle fracture).

599.     Officers in Beshai did not report that they used force to restrain him or that the boy complained of being hurt while being handcuffed or that he had to be emergently admitted to a hospital because of a fractured elbow.

600.     Instead, the officer that prepared the incident report reported the child was taken to a local area hospital for a possible involuntary mental health commitment but not that he had been injured.

601.     When the mother complained to the police she was interviewed by police but the officers were not interviewed by the WPD BOPS.

602.     However, both of the officers that came in contact with the minor child admitted to police that the child began to experience pain while being placed in handcuffs and not during the police takedown.

603.     The investigating supervisor from the BOPS suggested the complaint of excessive force should be exonerated under the reasoning, "*If we analyze the statements from each party we can surmise this; there was an incident that involved officers handcuffing Mr. T____. Ms. Beshai states Mr. T____ was pulled from the vehicle. Officer Alers' recollection has Mr. T _____ running from the vehicle towards the street which is clearly in contention with Ms. Beshai's recollection. There is no video to clearly prove whose memory is more accurate.  They can all agree that Mr. T_____ was brought to the ground and handcuffed. The question is was it necessary to restrain Mr. T_____? If so, how much force was required? Ms. Beshai contends that her son was calm. Officer Alers disagrees. Again, there is no video to clearly prove or disprove the memories of Ms. Beshai and Officer Alers. We can agree that*

*the police force used rose to a level 3 on the force continuum. A compliance technique, a "take down" was utilized. Could Mr. T\_\_\_\_\_ have been injured during the take down or the handcuffing? Yes. Was there unnecessary force used? We can neither prove nor disprove the allegation with conflicting statements, no witness testimony, and no video*."

604.     It should be noted that when JT's arm was broken while being placed in handcuffs the City of Worcester, the second largest City in New England did not have a body worn camera program in place.

605.     This was due to the fact that Chief Sargent had publicly expressed that police cameras made officers "feel pressure to maintain the demeanor of someone testifying in court" and it has "the potential to hurt officers' enjoyment of their jobs, and to reduce community engagement."

606.     Chief Sargent publicly noted, "some officers might be less willing to engage in proactive policing when they are afraid that every mistake they make has the potential to subject them to public criticism" and might become hesitant to use necessary force due to concern over being criticized by the media."

607.     The commanding officer of the unit agreed with the "logic" and reasoning of his subordinate investigator claiming to sustain the complaint he needed "preponderance of the evidence."

608.     He explained the two conflicting accounts canceled each other out, claiming, "*There was no other evidence that we could use. There was no other witnesses that could show exactly what happened. . . . I need preponderance of the evidence."*

609.     Although both officers conceded that the minor had only complained of pain in his elbow while being handcuffed the commanding officer of the unit testified "I don't know the- you know, if he had an injury prior to that, was there something that occurred at home. I don't know."

610.     Despite the officer's testimony the child's injury appeared to have occurred while being placed in handcuffs and not before, he insisted they would still be exonerated testifying "No, it would be the same (outcome)."

611.     Chief Sargent agreed with the logic of the investigation by accepting the conclusion of his investigators uncritically and claiming "*I believe that—I believe that they, you know, they did what they had to do to protect this individual and others, so—it is—I believe it was appropriate . . . . It was a restraint that needed to be done, they felt needed to be done to protect the young man.*" Chief Sargent explained he had no concerns about the level of force despite having an avulsion fracture and surgery that followed because "*The intent wasn't to hurt the young man. The intent was to help the young man . . . I believe that the force was necessary and appropriate."*

70

612.     Likewise, the City Manager, Edward Augustus, responsible for firing police officers and disciplining them, like other city officials testified he was not troubled at all with the conclusions reached by the WPD BOPS because there appeared to be two competing versions. Augustus noted, investigators "*doesn't have any way to break the tie based on the information that he got*" adding, he was not an expert on police investigatory practices or a medical expert to figure out how JT's injuries occurred.

613.     The City never retained an expert to figure out when the child was injured and BOPS investigators did not follow-up with any medical providers of the child to figure out what caused the child's injury.

614.     A Pediatric Orthopedic surgeon expert retained by Beshai concluded, "*It is my opinion with a reasonable degree of medical certainty that the process of putting this child into cuffs did cause the elbow fracture. It was either caused when the wrists were in cuffs and the child was trying to get free of the officers or it could possibly have been caused from the active taking the arm and putting the arm into the handcuffs. At any rate, it is my opinion that the avulsion injury definitely happened from the incident of apprehending Mr. Torres and putting his right arm into the handcuffs.*"

615.     In *Agyeah v. City of Worcester, et al,* Case No. 4:21-cv-40020 Dkt. 5, (D. Mass. Feb. 19, 2021) an African immigrant sued members of the narcotics unit for fabrication of evidence, false reporting, for assault and battery, resisting arrest, breaches of peace against them when they arrested him while filming the police during the beating of another immigrant who was allegedly attempting to solicit a police decoy pretending to be a sex worker.

616.     Police asked him repeatedly why he was recording the police and to provide them with the password to his phone but when he refused to do so he was arrested.

617.     While were deliberately twisting his handcuffed hands and twisting his fingers to inflict pain, he defecated on himself and when he asked narcotics officers not to abuse him he was asked by one of them "Is this how you fucking monkeys treat your police officers?"

618.     In early 2023, during discovery in Agyeah, the commanding officer of the BOPS who had been leading that department since 2016 intimated that since 2016 Chief Sargent had not sustained a single complaint for the use of excessive force on the part of a Worcester police officer.

619.     Or in Ayala-Melendez v. City of Worcester, CA No. 20-11453, Dkt. 26-1 Amended Complaint (D. Mass. Feb. 22, 2021) the federal case involved a Worcester police officer that set a vicious police dog on a peaceful, unsuspecting man from behind without provocation or legal cause of any kind whatsoever, then failed to seek prompt medical attention for the resulting injuries and falsely and maliciously charged him with serious crimes based on fictional account of riotous conduct. As he

calmly addressed an officer, who engaged with him and gave no sign of concern about his conduct, Officer Shawn G. Tivnan grabbed him from behind and swung him into the jaws of K-9, as a second officer joined in the assault.

620.    The plaintiff suffered a number of lacerations and abrasions, was traumatized by the experience and subjected to great public embarrassment, concern for his reputation and future, and legal expenses arising from publicized accusations of assault and battery on police, resisting arrest and disorderly conduct.

621.    Even though it is a crime for police officers in Massachusetts to file false police reports Officer Tivnan was not charged with criminal conduct.

622.    Chief Sargent recently explained why Officer Tivnan was not criminally charged for preparing a false report and setting in motion the criminal prosecuting Ayala-Melendez: *"I believe it was a mistake of the head and not of the heart. I don't think he wrote a false report intentionally, but it was not accurate. It was not an accurate report to what happened that I could see. We didn't have the opportunity to interview the complainant*. [Mr. Ayala-Melendez]."

623.    The City Manager, in line with Chief Sargent, testified in early February 2022 he was unaware police officers can be criminally charged when they prepare false police reports, and the WPD have never charged a single Worcester officer who has been administratively found to have filed a false police report.

624.    His response as the firing and hiring authority for the police department demonstrated deliberate indifference to the rights of citizens that come in contact with police.

625.    Despite Chief Sargent's musing about Officer Tivnan's state of mind when Mattis bit Ayala-Melendez on October 19, 2021, he also informed the Office of the District Attorney's Office that Officer Shawn Tivnan had "*lied about a defendant's conduct and thereby allowed a false or inflated criminal charge to be prosecuted*."

626.    On January 26, 2021 the City Manager provided Officer Tivnan with a Notice of Contemplated Discipline Hearing under MGL, c. 31§ 41 and requesting a forty (40) tour suspension alleging: "*It is clear from reviewing the video that your reporting of your interaction with Mr. Ayala-Melendez is not accurate. Once you pushed Mr. Ayala-Melendez toward Franklin Street, K-9 Mattis engaged Mr. Ayala-Melendez by biting his lower back. Mr. Ayala-Melendez did not, as you assert, come back toward you. When provided with an opportunity to amend your report in light of the video, you stood by your original account.* **Conclusion** *If the allegations contained herein are true, the forty (40) tour suspension is warranted.*" (Emphasis supplied).

627.    Despite the City Manager's condemnation of Officer Tivnan's false reporting, he, like the Chief, and the BOPS chose not to go after Officer Tivnan for allowing a vicious dog to maul Ayala-Melendez by portraying the incident as "*...[a]n*

*accidental byproduct of the interaction. It wasn't, at least from what I could tell, an order to the dog, bite or attack, or anything of that nature."*

628.     Despite exonerating itself from wrongdoing by claiming there was a policy failure, to be sure, to a policy that Chief Sargent promulgated in 2017, it took more than two years for the City to amend policy 401.

629.     The City, the Chief police or the City Manager have not moved to have Officer Tivnan fired for fabricating evidence.

630.     On September 2022, the City agreed to pay Ayala-Melendez the sum of $275,000 to compensate him for violation of his civil rights.

631.     In Eric Rojas-Rodriguez v. Officer Daniel Pennellatore, City of Worcester, Edward M. Augustus and Chief Steven W. Sargent, U.S. District Court, CA No. 4:22-cv-40034-TSH (D. Mass. Mar. 31, 2022) Rojas Rodriguez alleged he was mauled by a WPD K-9 and that police fabricated evidence.

632.     The complaint alleges that a Worcester officer purposely sicced a vicious police dog on a restrained and unsuspecting man from behind without provocation or legal cause of any kind whatsoever. The victim, Eric Rojas Rodriguez, was kicked in the face, repeatedly punched while on the ground, and mauled by a police K-9 even though he was already handcuffed. The officer then falsely and maliciously charged him with serious crimes based on fictional account of riotous and assaultive conduct. Mr. Rojas suffered what a treating plastic surgeon described as five lacerations with significant soft tissue damage (muscle injury) in the medial calf along with two posterior lacerations.

633.     Rojas Rodriguez alleged in his complaint he was disabled for months, unable to step on his left leg, was traumatized by the horrific experience, and subjected to great public embarrassment. The mauling resulted in significant scarring, atrophy and deformity to his left leg and calf.

 

 

634.     Rojas Rodriguez was accused of assault and battery on police, (punching an officer on the back of the head) resisting arrest and disorderly conduct and disturbing the peace. All charges except one, for disorderly conduct, were dismissed at the request of the Commonwealth and with the consent and agreement of members of the Worcester police department after a surveillance video and cell phone video of the incident surfaced that contradicted the falsehoods of the false police narrative, i.e., Rojas Rodriguez never struck a police officer, was not given any warning before being mauled by the police K-9 and a video also demonstrates that the K-9 was allowed to bite even after he had handcuffed.

635.     An internal investigation uncritically excused police official lies and deception and spun the police explanation to justify the K-9 mauling constituted a lawful use of force.

636.     Sgt. Avedian from the BOPS attempted to harmonize false reports with surveillance tapes as follows:

637.     "On July 07, 2022, a second interview was conducted with Officer Daniel Pennellatore in order to view a video that was secured by Officer Kevin McCarthy and entered into the Detective Bureau as evidence for court on April l. 2019. This video had not been reviewed by Officer Pennellatore at the time of the incident nor was he afforded the opportunity to review the video with ADA Nathan Morse and his boss Jeff Travers who had decided not to pursue three out of the four charges against Eric Rojas Rodriguez. As stated earlier in this report, Officer Pennellatore was never involved in the court process and was not aware that these charges were dropped or given the ability to review the videos that were in their possession. After Officer Pennellatore reviewed the video (2019-03036) for the first time, he stated that it appeared that Eric Rojas Rodriguez had struck a bouncer and not Officer Kevin McCarthy as he had written in his original report. Officer Pennellatore had stated when he wrote his original report it was his " perception" that led him to believe that he had seen Eric Rojas Rodriguez strike Officer Kevin McCarthy. After Officer Pennellatore reviewed the video a supplemental report was submitted and a copy is on file in the BOPS case file 2022-0011 .  There seemed to be absolutely no deception on the officer's incident reports (as alleged by Attorney Pineiro) and that each report is independent of each other's arrests. As stated earlier in the report, Eric Rojas' charges were all dismissed without prejudice except for Disorderly Conduct which was continued without a finding and dismissed if he was to seek employment

or school. It again should be noted that there was no agreement amongst the four officers named in this lawsuit agreeing to have the charges dismissed after reviewing the videos provided by Attorney Pineiro.

638.  Chief Sargent, who is responsible under the Massachusetts injured prisoner statute to document how police officers use force in the field so that it complies with constitutional requirements testified during a January 2022 depositions along with the City Manager they were unaware of the existence of Rojas' case or the photographs of his injuries.

639.  Chief Sargent trivialized and deflected the question of whether he thought Rojas injuries were serious, "*Once again, I'm -- it's not relevant. I don't know what would be considered serious unless I got the medical report and I could read it. I may still not understand.*"

640.  City Manager Augustus, like Sargent, staunchly refused to characterize Rojas' injuries as serious despite their grotesque appearance as revealed in photographs: "*It's hard for me to say, you know. There's some kind of wound but, again, how much of it is dried blood and what is the wound, I don't know.*"

641.  Chief Sargent would only concede Rojas' mauling "*…it looks bloody.*"

642.  On December 12, 2022 Brima Fofana, an African-American male and Felipe Paniuaga sued an elite group of police officers who racially profiled him, followed him, conducted a car stop and without warning violently pulled Fofana and Paniagua from the car that rolled down accidentally and struck a street pole.

643.  They went onto charge Fofana with very serious charges which included assault and battery with a dangerous weapon, negligent operation.

644.  The crux of the false reporting involved a patently false police report from that suggested a demonstrably false police narrative: "Once we exited and approached the Volkswagen*, the operator began to pull off swerving at and striking other officers. The operator attempted to flee and struck a street light pole. PO Stephen Mithchell, Brendon Tivnan and I were able to get the operator out of the vehicle and place him in handcuffs and arrested. The operator was identified as Brima Fofana and transported to the station via the patrol wagon.*"

645.  Worcester traffic cameras and other surveillance cameras demonstrated none of this happened.

646.  But none of this matter to the WPD BOPS specially the lead investigator, Sgt. Pageau who went out of his way to justify fabrication of evidence, an act that if not for the video surveillance tapes would have landed Fofana and Paniagua in jail:

647.       "Initially officers' perception was that everything occurred "simultaneously" and that Mr. Fofana was in the vehicle when it struck the light pole and they wrote their report from that perspective. It was only when they reviewed the video carefully, in a controlled environment and numerous times did they realize that their perception of the events was slightly different than the video indicates. Two of the officers directly involved stating it all seemed to happen simultaneously and within seconds of each other. The third officer (Frigon) did not initially address the order of events but did so in his BOPS report and came to his conclusions, once again, only after carefully reviewing the video. Officer Mitchell stated in his report this was a "rapidly evolving incident". The events occur while officers are trying to coordinate a traffic stop, advise other officers of the rapidly changing circumstances while also attempting to assure police and civilian safety during a potentially volatile situation. All of this happening simultaneously while also attempting to apprehend a non-cooperative subject of a drug investigation. Factoring in stress and tunnel vision ones perception may be slightly different than the actual events. The vehicle appears to hit the curbing before hitting the pole which is assuredly the cause of some confusion as to the exact timing of events as the officers were attempting to get Mr. Fofana out of the vehicle. ft remains clear and officers do not deny that Mr. Fofana was forcibly removed from a vehicle as it struck an object while trying to elude police custody."

648.       The report continued: "The video obtained from cameras at the intersection of Tuckerman and Salisbury St. is in three sections one eight minutes fifty-five seconds, the next nine minutes, and four seconds and the third four minutes and fifty-seven seconds. Viewing the initial recording of the incident from Salisbury and Tuckerman St.at or 18:38:27 one can see the part of the video in question, upon viewing carefully and repeatedly it appears the vehicle is trying to avoid being stopped by the police. As it creeps forward officers engage the vehicle and subjects within. At this point it lurched (possibly hitting the curb) a male subject falls to the ground and the vehicle strikes curbing then stops up against the light pole all within seconds of each other. The vehicle appears to hit and stop twice once on the curb and once against the light pole. This may explain why when the vehicle first hit something officers assumed it was the pole though through careful and repeated viewing of the video it appears that the vehicle may have hit the curb first. It then lurched forward again and struck the pole. Officers would not have been aware of this as they were engaged in efforts to get the vehicle stopped ad arrest the non-cooperative subject (s) within. The perception of the officers was that the vehicle "struck" something as they were trying to affect an arrest as indicated in their reports. In the end this all comes down to perception of events. During the event all officers perceived the events the same and wrote their reports accordingly. That is that the vehicle "struck" something as they were trying to place two fleeing subjects under arrest. Only after viewing the video several times in a controlled environment and with the benefit of time and the ability to view it as many times as possible did officers realize the events, which occurred within seconds of each other were slightly different than first believed. Armed with this information the officers

involved resubmitted their BOPS reports to more accurately reflect the exact order of events."

649.    Only one officer was investigated. He was not investigated at all for unreasonable use of force and was exonerated from "Awareness of Activities" despite the fact he had a long trove of civilian complaints for excessive use of force complaint, neglect of duty, incompetence, mishandling evidence and other charges

650.    Or in Carlos Alvarez v. City of Worcester, et al Case No. 4:20-cv-40004-TSH (D. Mass. Jan. 8, 2020) the City of Worcester agreed to pay Carlos Alvarez $275,000 in November 2022 in a civil rights case alleging fabrication of evidence.

651.    In Alvarez, the officer sought criminal charges against the Plaintiff and submitted an application for criminal complaint citing the presence of the text message as evidence of the Plaintiff's involvement in drug distribution. The officer wrote in his application that he read the text message from the phone's outer screen but did not open the phone or press buttons. The officer's statement about the text message was demonstrably false because the seized phone is incapable of displaying text messages on its outer screen. The officer deliberately repeated this falsehood throughout the course of the criminal proceedings against the Plaintiff. The officer falsely testified on three occasions: at the Grand Jury proceedings, at an evidentiary hearing on the Plaintiff's motion to suppress and at the Plaintiff's trial. As a direct and proximate result of the officer's conduct in the criminal proceedings, and the customs and practices Plaintiff was wrongfully convicted for approximately 3 years.

652.    No one has ever been held to account for Alvarez' 3-year wrongful incarceration precipitated by an unlawful arrest and fabrication of evidence.

653.    A forensic review of the phone in question demonstrated there was significant activity on the phone after Mr. Alvarez was arrested demonstrating the phone was opened and buttons were pressed in order to make outgoing phone calls, accepted three incoming calls, and read text messages that were in the "read" state.

654.    In Cosenza v. City of Worcester et al, Case No. 4:18-cv-10936-TSH Dkt. 102, (D. Mass. Oct. 21, 2020) a federal jury returned an $8 million verdict in favor of Cosenza on September 30, 2022 after a jury found police fabricated evidence to convict him.

655.    No one was ever sanctioned or disciplined on account of Cosenza's wrongful incarceration flowing from fabrication of evidence.

656.    The policy, practice, and usage of the City, Chief of Police and Mr. Augustus of impunity for the use of excessive force and other police misconduct is further evidenced by events following the arrest of Rev. Joseph Rizzuti, Pastor Joseph Rizzuti Jr. Karissa Rizzuti, that resulted in him being tased, beaten and his daughter

in law punched by the police. Rizzuti v. Officer Michael Cappabianca, Jr. et al, District of Massachusetts, CA No. 4:22-cv-40094-AK.

657.    On February 1, 2022 the City Manager was asked to express his reaction to the dismissal of criminal charges during the George Floyd protests of June 1, 2020.

658.    His response was a classic exercise of burying his head in the sand: *"I don't know if I had a reaction, you know. Cases, you know, the courts deal with the cases as they see fit, or the DA's office as he sits fit, so I don't know if I had a reaction."*

659.    But Sargent did have a reaction to the District Attorney's dismissal of the criminal case- it was red meat to the rank and file of the WPD: "We are very surprised and disappointed that these charges have been dropped without prior consultation with anyone at the Worcester Police Department," he wrote in a statement.

660.    City Manager Augustus when questioned in his capacity as conservator of the peace in the City whether he monitored the progress of that particular investigation he responded: *"You know, I keep it a very high level of conversation with the chief but I don't get into the minutia of any investigations."*

661.    Despite these shocking revelations the reaction by the City of Worcester, its Chief of Police and the City Manager have been astonishingly tolerant.

662.    These policies, customs and practices of the City of Worcester, of its Chief of Police and Mr. Augustus were the moving forces behind the violations of the Plaintiffs' constitutional rights committed by all defendants in this case.

CLASS ACTION ALLEGATIONS

663.    Pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, the named Plaintiffs seek to represent a certified Plaintiff classes consisting of (a) all persons who observed, photographed or video recorded protesters or police at a rally, march, or other demonstration in the City of Worcester on June 1 or 2, 2020 protesting the death of George Floyd in police custody in Minneapolis, Minnesota, on May 25, 2020; all such persons who were arrested on charges arising from their presence at the said activities or events and whose charges were dismissed; all such persons, whether or not arrested, that police assaulted and battered without legal cause or excuse, including but not limited to all such persons, regardless of whether or not they were arrested, harmed or injured as a result of being targeted by police with chemical munitions or projectiles – the Damages Class; (b) all members of the public present or who may be present within the city limits of the City of Worcester who carrying on their persons cameras, cell phones or other devices capable of capturing photographs or video, audio or audio-video recordings who at any time photograph or record the public conduct of Worcester police officers or who attempt to do so – the Injunctive Class.

664.     Each named Plaintiff is a member of both the Damages and Injunctive classes.

## THE DAMAGES CLASS

665.     Given the high residential density of urban areas affected by the June 1 and 2, 2020, demonstrations and the police response thereto, the numbers of people drawn from their homes by the commotion who either sought to record or photograph the activity, and/or who were arrested, battered, or gassed by police, are not readily ascertainable. Due to the potentially large numbers in this group and the difficulties involved in identifying them joinder of the Damages Class members individually is impractical.

666.     Upon information and belief, many members of the class are without the means to retain an attorney to represent them in a civil rights lawsuit

667.     In addition, joinder is impractical because, upon information and belief, many members of this class are not aware that their constitutional and statutory rights were violated and that they have the right to redress in Court.

## THE INJUNCTIVE CLASS

668.     At present the population of Worcester exceeds 205,00.  The people, residents or visitors, carrying cell phones or cameras within the city limits at any given time can reliably be estimated in the hundreds of thousands. Joinder is impracticable due to the size of this class and because any individual member has scant incentive to seek prospective relief as a solitary litigant. The only practical approach to obtaining injunctive relief to protect each individual's right to record public conduct of police is to do so collectively as a class.

669.     Common questions of law and fact predominate over individual ones among members of both classes, including but not limited to:

    a.     Whether the City and WPD engage in a policy, practice, and/or custom of allowing police to visit unlawful reprisals -- by means of false arrest, excessive force, malicious prosecution, threats, intimidation, coercion, assault, or battery -- upon persons exercising their First Amendment right to record public conduct of police;

    b.     Whether the City and WPD engage in a policy, practice, and/or custom of allowing police supervisors to refrain from reporting or instituting disciplinary proceedings against perpetuators of the aforesaid conduct;

    c.     Whether the City and WPD engage in a policy, practice, and/or custom of allowing police officers and to refrain from intervening in or reporting instances of the aforesaid conduct;

    d.     Whether, when members of the public complain to the WPD over being subjected to the aforesaid conduct, the City and WPD engage in a policy, practice, and/or custom

of purporting to investigate complaints while in fact whitewashing them and refusing to hold offenders accountable;

e.      Whether the Worcester chief of police and other high-ranking members of the WPD chain of command have knowingly and deliberately failed to screen, train, supervise, monitor, and discipline officers to prevent instances of the aforesaid conduct or to hold perpetrators accountable for them.

e.      Whether the City, City Manager Augustus, the WPD, and/or Police Chief Steven Sargent and other supervisory defendants have sanctioned and/or deliberately failed to rectify the aforesaid unconstitutional practices and customs, and whether such acts and omissions have resulted in and will continue to result in constitutional violations by police officers against class members.

670.    These common questions of fact and law all flow from the same policies, observed and implemented by the named and unnamed Defendants. Defendant City of Worcester's city-wide policies, practices, and custom with regard to recording and documenting police officers' public conduct constitutes a unitary scheme under which the Defendants violate the constitutional rights of Class members.

671.    The named Plaintiffs and all class members were and are victimized by these same policies of intentionally engaging in, allowing and refusing to hold officers accountable for the misuse and abuse of their authority and powers to unlawfully retaliate against persons exercising their First Amendment right to record and document public police conduct, in violation of the First, Fourth and Fourteenth Amendments of the United States Constitution, Article 16 of the Massachusetts Declaration of Rights and the Massachusetts Civil Rights Act.

672.    The Defendant the City of Worcester New failed to implement constitutional police policies city-wide and failed to review and remediate noncompliance with the First, Fourth, and Fourteenth Amendments in the WPD response to citizens photographing or recording public conduct of police.

673.    The named Plaintiffs are adequate class representatives because they were and are directly impacted by the Defendants' intentional and violent uses of excessive force and abuse of the arrest power to punish persons for the lawful and peaceful exercise of their constitutional rights.

674.    Plaintiffs are typical of the members of each class. Like other members of both the Injunctive and Damages Classes, named Plaintiffs were subject to First Amendment Retaliation via the use of excessive force, false arrest, malicious prosecution, and denial of redress by the WPD.

675.    Like other members of both the Injunctive and Damages Classes, without redress and injunctive relief the named Plaintiffs remain at risk of being subject to the deprivations and violations of constitutional rights complained of herein whenever they exercise their right to record or photograph public conduct of police.

676.     The legal theories under which the named Plaintiffs seek relief are the same or similar to those on which all class members rely, and the harms suffered by the named Plaintiffs are typical of the harms suffered and to be suffered by the class members.

677.     The named Plaintiffs have a strong personal and representational interests in the outcome of this action, have no conflicts of interest with members of either class, and will fairly and adequately protect the interests of each class. Plaintiffs' interests are not antagonistic to, or in conflict with, the interests of the classes as a whole.

678.     Plaintiffs are represented by Hector E. Pineiro, an experienced criminal and civil rights lawyer, Joseph F. Hennessey, an experienced criminal lawyer, and Robert A. Scott, an experienced civil rights lawyer. All counsel practice in Worcester. Attorneys Pineiro and Scott ae experiences in class action litigation

679.     Plaintiffs counsel have the resources, expertise, and experience to prosecute this action, and know of no conflicts among members of the class or between the attorneys and members of the class.

680.     The Injunctive Class should be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because the Defendants have acted on grounds generally applicable to the class, in engaging in the aforementioned practices and failing to correct the aforementioned unconstitutional policies thereby making class-wide declaratory and injunctive relief appropriate.

681.     The Damages Class should be certified pursuant to Rule 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only individual class members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## COUNT I

### 42 U.S.C. § 1983/Unreasonable Force All Plaintiffs

### Officer Frigon, Tivnan & Coleman, Kubiak, Piskator, LaFleche, Green, Sgt. Girouard, Sgt. Lopopolo, Sgt. Maher, Lt. Doherty, Chao, Sgt. Watkins and John Doe's - Individually

682.     Each of the foregoing paragraphs is incorporated as if fully set forth herein.

683.     Each of the foregoing paragraphs is incorporated as if fully set forth herein.

684.     Defendants used unreasonable and excessive force against Plaintiffs.

685.     Defendants Frigon, Tivnan & Coleman deprived Plaintiff Amarat of a well-established right to freedom from the use of unreasonable force.

686.     Frigon, Coleman and Tivnan used unreasonable and excessive force against Plaintiff.

687.     Defendants Green and Does deprived Plaintiff Crum of a well-established right to freedom from the use of unreasonable force.

688.     Green and Does used unreasonable and excessive force against Plaintiff Crum.

689.      Defendants Girouard, Maher and Does deprived Plaintiff Demanbey of a well-established right to freedom from the use of unreasonable force.

690.     Girouard, Maher and Does used unreasonable and excessive force against Plaintiff Demanbey.

691.     Defendants Kubiak, Chao and Doe deprived Plaintiff Verchin of a well-established right to freedom from the use of unreasonable force.

692.     Defendants Kubiak, Chao and Doe used unreasonable and excessive force against Plaintiff Verchin.

693.     Defendants Green and Doe deprived Plaintiff Drapeau of a well-established right to freedom from the use of unreasonable force.

694.     Green and Doe used unreasonable and excessive force against Plaintiff Drapeau. Defendants Piskator and Doe deprived Plaintiffs' Barerra of a well-established right to freedom from the use of unreasonable force.

695.     Piskator and Doe used unreasonable and excessive force against Plaintiff Barerra.

696.     Defendants Maher and Doe deprived Plaintiff Marcotte of a well-established right to freedom from the use of unreasonable force.

697.     Maher and Doe used unreasonable and excessive force against Plaintiff Marcotte.

698.     Defendants Doherty, Watkins and Doe deprived Plaintiff Cummings of a well-established right to freedom from the use of unreasonable force.

699.     Doherty, Watkins and Doe used unreasonable and excessive force against Plaintiff Cummings.

700.     Defendants LaFleche and Does deprived Plaintiff Veronica Euga of a well-established right to freedom from the use of unreasonable force.

701.     Defendants LaFleche and Does used unreasonable and excessive force against Plaintiff Veronica Euga.

702.     Defendants LaFleche and Does deprived Plaintiff Veronica Euga of a well-established right to freedom from the use of unreasonable force.

703.     Defendants LaFleche and Does used unreasonable and excessive force against Plaintiff Veronica Euga.

704.     Defendants Lopopolo and Does deprived Plaintiff Christopher Euga of a well-established right to freedom from the use of unreasonable force.

705.     Defendants Lopopolo and Does used unreasonable and excessive force against Plaintiff Christopher Euga.

706.     Defendant Does deprived Plaintiff Bishop of a well-established right to freedom from the use of unreasonable force.

707.     Defendants Does used unreasonable and excessive force against Plaintiff Bishop

708.     As a direct and proximate result of Defendants' actions, Plaintiffs suffered the damages described above.

## COUNT II

### 42 U.S.C. § 1983/First Amendment Violation and Retaliation against Defendants Officer Frigon, Tivnan & Coleman, Kubiak, Piskator, LaFleche, Green, Sgt. Girouard, Sgt. Lopopolo, Sgt. Maher, Lt. Doherty, Chao, Sgt. Watkins and John Doe's, Individually, City of Worcester,  Chief Sargent and City Manager Augustus

709.     Each of the foregoing paragraphs is incorporated as if fully set forth herein.

710.     All Defendants at the scene used unreasonable and excessive force against Plaintiffs and or failed to intervene to prevent other officers from doing so.

711.     Defendants police officers and other Worcester police officers used unreasonable force against peaceful protesters during this incident.

712.     Defendants Frigon, Coleman, Kubiak, Piskator, LaFleche, Green, Girouard, Lopopolo, Maher, Doherty, Chao, Watkins and Does used unreasonable force against the Plaintiffs because of the content of the protest and because they felt that Plaintiff and other protesters were protesting against them.

713.     Defendants also violated their First Amendment rights including but not limited to, in retaliating against Plaintiffs for engaging in speech or conduct protected by the First Amendment, including falsely arresting Plaintiffs because of protesting or because they were filming the police, or because they engaged in journalistic activities and by selectively enforcing laws and regulations against Plaintiffs and in otherwise violating Plaintiffs' rights and engaging in the acts and omissions complained herein.

714.     Plaintiffs had a well-established constitutional right not to be punished based on their status as a bystander, protesters, journalist/photojournalist and based on the peaceful expression of the content of their views.

715.    As a direct and proximate result of Defendants' actions, Plaintiffs suffered the damages described above.

## COUNT III

### Assault & Battery/Assault: Amarat, Officers Frigon, Coleman and Tivnan

716.    Each of the foregoing paragraphs is incorporated as if fully set forth herein. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

717.    Officers Frigon, Coleman and Tivnan committed an assault and/or and assault and battery against Amarat without reason or cause.

718.    As a direct and proximate result thereof, Amarat suffered an assault and battery and was harmed.

## COUNT IV

### Assault & Battery Crum, Officers Green and Does

719.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

720.    Officers Green and Does committed an assault and battery against Crum without reason or cause.

721.    As a direct and proximate result thereof, Crum suffered an assault and battery and was harmed.

## COUNT V

### Assault & Battery/ Demanbey Lt. Michael Girouard & Sgt. Ryan J. Maher and Doe

722.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

723.    Lt. Michael Girouard & Sgt. Ryan J. Maher and Doe committed an assault and battery against Demanbey without reason or cause.

724.    As a direct and proximate result thereof, Dembanbey suffered an assault and battery and was harmed.

## COUNT VI

### Assault & Battery/ Verchin Officers Kubiak, Chao and Doe

725.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

726.    Officers Kubiak, Chao and Doe committed an assault and battery against Verchin

without reason or cause.

727.     As a direct and proximate result thereof, Dembanbey suffered an assault and battery and was harmed.

## COUNT VII

### Assault & Battery/Drapeau Officers Green and Doe

728.     Each of the foregoing paragraphs is incorporated as if fully set forth herein.

729.     Officers Green and Doe committed an assault and battery against Drapeau without reason or cause.

730.     As a direct and proximate result thereof, Drapeau suffered an assault and battery and was harmed

## COUNT VIII

### Assault & Battery/Barrera Officers Piskator and Doe

731.     As a direct and proximate result thereof, Drapeau suffered an assault and battery and was harmed.

732.     Each of the foregoing paragraphs is incorporated as if fully set forth herein.

733.     Officers Green and Doe committed an assault and battery against Barrera without reason or cause.

734.     As a direct and proximate result thereof, Barrera suffered an assault and battery and was harmed.

735.     As a direct and proximate result thereof, Barrera suffered an assault and battery and was harmed.

## COUNT IX

### Assault & Battery/Marcotte Sgt. Maher and Does

Each of the foregoing paragraphs is incorporated as if fully set forth herein.

736.     Each of the foregoing paragraphs is incorporated as if fully set forth herein.

737.     Sgt. Maher and Does committed an assault and battery against Marcotte without reason or cause.

738.     As a direct and proximate result thereof, Marcotte suffered an assault and battery and was harmed.

## COUNT X

### Assault & Battery/Cummings, Sgt. Maher, Sgt. Watkins and Doe

739.     Each of the foregoing paragraphs is incorporated as if fully set forth herein.

740.     Officers Green and Doe committed an assault and battery against Barrera u without reason or cause.

741.     As a direct and proximate result thereof, Cummings suffered an assault and battery and was harmed.

## COUNT XI

### Assault & Battery/Veronica Euga, Officer LaFleche and Doe

742.     Each of the foregoing paragraphs is incorporated as if fully set forth herein.

743.     Officers LaFleche and committed an assault and battery against Veronica Euga without reason or cause.

744.     As a direct and proximate result thereof, Veronica Euga suffered an assault and battery and was harmed.

## COUNT XII

### Assault & Battery/Christopher Euga, Sgt. Lopopolo and Doe

745.     Each of the foregoing paragraphs is incorporated as if fully set forth herein.

746.     Sgt. Lopopolo and Doe and committed an assault and battery against Christopher Euga without reason or cause.

747.     As a direct and proximate result thereof, Christopher Veronica Euga suffered an assault and battery and was harmed.

## COUNT XIII

### False Arrest and Malicious Prosecution/Officer Amarat Frigon, Coleman

748.     Each of the foregoing paragraphs is incorporated as if fully set forth herein.

749.     Officers Frigon and Coleman caused criminal charges to be brought against Plaintiff for which there was no probable cause, and they maliciously and for no lawful purpose assisted, participated in and otherwise caused him to be criminally prosecuted.

750.    On March 19, 2021 the Office of the Worcester County District Attorney's moved to dismiss the criminal complaint against Plaintiff on all charges.

751.    The dismissal of Plaintiff's criminal charges occurred because there was no credible evidence or probable cause that he had committed any crime.

752.    As a direct and proximate result thereof, Plaintiff lost time from his usual activities to attend court and to participate in his defense, and suffered concern and worry due to the reasonable perception that his liberty, well-being and good name were at imminent and serious risk as a result of his criminal prosecution.

## COUNT XIV

### False Arrest Malicious Prosecution/Amarat: Frigon, Coleman.

753.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

754.    Officers Frigon and Coleman caused criminal charges to be brought against Plaintiff for which there was no probable cause, and they maliciously and for no lawful purpose assisted, participated in and otherwise caused him to be criminally prosecuted.

755.    On March 19, 2021 the Office of the Worcester County District Attorney's moved to dismiss the criminal complaint against Plaintiff on all charges.

756.    The dismissal of Plaintiff's criminal charges occurred because there was no credible evidence or probable cause that he had committed any crime.

757.    As a direct and proximate result thereof, Plaintiff lost time from his usual activities to attend court and to participate in his defense, and suffered concern and worry due to the reasonable perception that his liberty, well-being and good name were at imminent and serious risk as a result of his criminal prosecution.

## COUNT XV

### False Arrest Malicious Prosecution/ Crum: Officer Green and Doe

758.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

759.    Officers Green and Doe caused criminal charges to be brought against Plaintiff for which there was no probable cause, and they maliciously and for no lawful purpose assisted, participated in and otherwise caused him to be criminally prosecuted.

760.    On March 19, 2021 the Office of the Worcester County District Attorney's moved to dismiss the criminal complaint against Plaintiff on all charges.

761.    The dismissal of Plaintiff's criminal charges occurred because there was no credible

evidence or probable cause that she had committed any crime.

762.     As a direct and proximate result thereof, Plaintiff lost time from his usual activities to attend court and to participate in his defense, and suffered concern and worry due to the reasonable perception that his liberty, well-being and good name were at imminent and serious risk as a result of his criminal prosecution.


## COUNT XVI

### False Arrest Malicious Prosecution/ Demanbey: Demanbey Lt. Michael Girouard & Sgt. Ryan J. Maher and Doe

763.     Each of the foregoing paragraphs is incorporated as if fully set forth herein.

764.     Lt. Girouard, Sgt. Maher and Doe caused criminal charges to be brought against Plaintiff for which there was no probable cause, and they maliciously and for no lawful purpose assisted, participated in and otherwise caused him to be criminally prosecuted.

765.     On March 19, 2021 the Office of the Worcester County District Attorney's moved to dismiss the criminal complaint against Plaintiff on all charges.

766.     The dismissal of Plaintiff's criminal charges occurred because there was no credible evidence or probable cause that he had committed any crime.

767.     As a direct and proximate result thereof, Plaintiff lost time from his usual activities to attend court and to participate in his defense, and suffered concern and worry due to the reasonable perception that his liberty, well-being and good name were at imminent and serious risk as a result of his criminal prosecution.

## COUNT XVII

### False Arrest Malicious Prosecution/Verchin Officers Kubiak, Chao and Doe

768.     Each of the foregoing paragraphs is incorporated as if fully set forth herein.

769.     Officers Kubiak, Chao and Doe caused criminal charges to be brought against Plaintiff for which there was no probable cause, and they maliciously and for no lawful purpose assisted, participated in and otherwise caused him to be criminally prosecuted.

770.     On March 19, 2021 the Office of the Worcester County District Attorney's moved to dismiss the criminal complaint against Plaintiff on all charges.

771.     The dismissal of Plaintiff's criminal charges occurred because there was no credible evidence or probable cause that she had committed any crime.

772.     As a direct and proximate result thereof, Plaintiff lost time from his usual activities to attend court and to participate in his defense, and suffered concern and worry due to the reasonable perception that his liberty, well-being and good name were at imminent and serious risk as a result of his criminal prosecution.

## COUNT XVIII

### False Arrest Malicious Prosecution/Drapeau Officers Green and Doe

773.     Each of the foregoing paragraphs is incorporated as if fully set forth herein.

774.     Officers Green and Doe caused criminal charges to be brought against Plaintiff for which there was no probable cause, and they maliciously and for no lawful purpose assisted, participated in and otherwise caused her to be criminally prosecuted.

775.     On March 19, 2021 the Office of the Worcester County District Attorney's moved to dismiss the criminal complaint against Plaintiff on all charges.

776.     The dismissal of Plaintiff's criminal charges occurred because there was no credible evidence or probable cause that she had committed any crime.

777.     As a direct and proximate result thereof, Plaintiff lost time from his usual activities to attend court and to participate in his defense, and suffered concern and worry due to the reasonable perception that his liberty, well-being and good name were at imminent and serious risk as a result of his criminal prosecution.

## COUNT XIX

### False Arrest Malicious Prosecution/Barrera Officers Piskator and Doe

778.     Each of the foregoing paragraphs is incorporated as if fully set forth herein.

779.     Officers Piskator and Doe caused criminal charges to be brought against Plaintiff for which there was no probable cause, and they maliciously and for no lawful purpose assisted, participated in and otherwise caused him to be criminally prosecuted.

780.     On March 19, 2021 the Office of the Worcester County District Attorney's moved to dismiss the criminal complaint against Plaintiff on all charges.

781.     The dismissal of Plaintiff's criminal charges occurred because there was no credible evidence or probable cause that he had committed any crime.

782.     As a direct and proximate result thereof, Plaintiff lost time from his usual activities to attend court and to participate in his defense, and suffered concern and worry due to the reasonable perception that his liberty, well-being and good name were at imminent and serious risk as a result of his criminal prosecution.

## COUNT XX

**False Arrest Malicious Prosecution/Marcotte Sgt. Maher and Officer Doe**.

783.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

784.    Sgt. Maher and Doe caused criminal charges to be brought against Plaintiff for which there was no probable cause, and they maliciously and for no lawful purpose assisted, participated in and otherwise caused him to be criminally prosecuted.

785.    On March 19, 2021 the Office of the Worcester County District Attorney's moved to dismiss the criminal complaint against Plaintiff on all charges.

786.    The dismissal of Plaintiff's criminal charges occurred because there was no credible evidence or probable cause that he had committed any crime.

787.    As a direct and proximate result thereof, Plaintiff lost time from his usual activities to attend court and to participate in his defense, and suffered concern and worry due to the reasonable perception that his liberty, well-being and good name were at imminent and serious risk as a result of his criminal prosecution.

## COUNT XXI

### False Arrest Malicious Prosecution/Cummings: Sgt. Maher, Sgt. Watkins and Officer Doe

788.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

789.    Sgt. Maher, Sgt. Watkins and Doe caused criminal charges to be brought against Plaintiff for which there was no probable cause, and they maliciously and for no lawful purpose assisted, participated in and otherwise caused him to be criminally prosecuted.

790.    On March 19, 2021 the Office of the Worcester County District Attorney's moved to dismiss the criminal complaint against Plaintiff on all charges.

791.    The dismissal of Plaintiff's criminal charges occurred because there was no credible evidence or probable cause that he had committed any crime.

792.    As a direct and proximate result thereof, Plaintiff lost time from his usual activities to attend court and to participate in his defense, and suffered concern and worry due to the reasonable perception that his liberty, well-being and good name were at imminent and serious risk as a result of his criminal prosecution.

## COUNT XXII

### False Arrest Malicious Prosecution/Veronica Eugas: Officer LaFleche and Officer Doe

793.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

794.     Officer LaFleche and Doe caused criminal charges to be brought against Plaintiff for which there was no probable cause, and they maliciously and for no lawful purpose assisted, participated in and otherwise caused her to be criminally prosecuted.

795.     On March 19, 2021 the Office of the Worcester County District Attorney's moved to dismiss the criminal complaint against Plaintiff on all charges.

796.     The dismissal of Plaintiff's criminal charges occurred because there was no credible evidence or probable cause that she had committed any crime.

797.     As a direct and proximate result thereof, Plaintiff lost time from his usual activities to attend court and to participate in his defense, and suffered concern and worry due to the reasonable perception that his liberty, well-being and good name were at imminent and serious risk as a result of his criminal prosecution.

## COUNT XXIII

### False Arrest Malicious Prosecution/Christopher Euga: Sgt. Lopopolo and Officer Doe

798.     Each of the foregoing paragraphs is incorporated as if fully set forth herein.

799.     Sgt. Lopopolo and Doe caused criminal charges to be brought against Plaintiff for which there was no probable cause, and they maliciously and for no lawful purpose assisted, participated in and otherwise caused him to be criminally prosecuted.

800.     On March 19, 2021 the Office of the Worcester County District Attorney's moved to dismiss the criminal complaint against Plaintiff on all charges.

801.     The dismissal of Plaintiff's criminal charges occurred because there was no credible evidence or probable cause that he had committed any crime.

802.     As a direct and proximate result thereof, Plaintiff lost time from his usual activities to attend court and to participate in his defense, and suffered concern and worry due to the reasonable perception that his liberty, well-being and good name were at imminent and serious risk as a result of his criminal prosecution.

## COUNT XXIV

### U.S.C. § 1983, Claim Against Defendant City of Worcester, Monell Liability

803.     Each of the foregoing paragraphs is incorporated as if fully set forth herein.

804.     The individual WPD Defendants' violations of Plaintiffs' constitutional rights were caused by the policies and customs of the City of Worcester as described above.

805.     The policies and customs of the Defendant City of Worcester were the moving force behind the actions of all Defendants resulting in the damages to the Plaintiffs

described above.

806.     As a direct and proximate result thereof, Plaintiffs suffered damages as set forth herein.

## COUNT XXV

### 42 U.S.C. § 1983, City Manager Augustus and Chief Sargent/Supervisory liability

807.     Each of the foregoing paragraphs is incorporated as if fully set forth herein.

808.     At all pertinent times Mr. Augustus was as a matter of law the keeper of the peace in the City of Worcester and as the City's chief executive had authority over the policy, practice, and usage of the City and the WPD regarding the use of force by police officers and their reporting of and accountability for the same.

809.     At all pertinent times hereto Sargent, as Chief of Police, exercised authority over the WPD and its officers and was a maker of policy as to standards of conduct and discipline within the WPD, and he had the power to discipline, including the power to effectively recommend dismissal of officers, and the power, authority, and duty to hold officers accountable for any use of excessive or unjustified force and for misstatements of fact in official reports.

810.     Besides this authority as policymaker at all pertinent times Mr. Augustus had authority over the hiring and firing of WPD officers and the WPD standards and practices of discipline and accountability.

811.     At all pertinent times both Chief Sargent and City Manager Mr. Augustus knew that without effective control of the use of force by police citizens are subject to violation of their constitutional rights, injury, and in some cases fatal injury.

812.     Notwithstanding the foregoing, as alleged herein both Chief Sargent and City Manager. Augustus observed and maintained a policy, practice, and usage of allowing *de facto* immunity to officers who physically abused or caused injury to persons in violation of their rights under the U.S. Constitution and he was at all pertinent times deliberately indifferent to the rights and safety of persons coming into contact with members of the WPD.

813.     By their acts and omissions in response to repeated incidents of unnecessary police violence Chief Sargent and City Manager Augustus demonstrated deliberate indifference to the rights and safety of persons coming into contact with WPD officers.

814.     As a direct and proximate result thereof, Plaintiffs suffered damages as set forth herein.

## COUNT XXVI

**Intentional Infliction of Emotional Distress Amarat**

**Officers: Frigon, Coleman and Tivnan**

815.     Plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein.

816.     The conduct of the Defendants named in this count constituted intentional infliction of emotional distress.

817.     By their actions, Defendants subjected Amarat to reprehensible conduct knowingly, intentionally, willfully, purposely, maliciously and with such reckless disregard of the consequences as to display a conscious indifference to the danger of harm and injury.

818.     As a direct result of the intentional conduct of the defendants in this count, Amarat suffered severe emotional distress and great pain of body and mind.

## COUNT XXVII

**Intentional Infliction of Emotional Distress: Crum**

**Officers: Geen and Doe**

819.     Plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein.

820.     The conduct of the Defendants named in this count constituted intentional infliction of emotional distress.

821.     By their actions, Defendants subjected Crum to reprehensible conduct knowingly, intentionally, willfully, purposely, maliciously and with such reckless disregard of the consequences as to display a conscious indifference to the danger of harm and injury.

822.     As a direct result of the intentional conduct of the defendants in this count, Crum suffered severe emotional distress and great pain of body and mind.

## COUNT XXVIII

**Intentional Infliction of Emotional Distress: Demanbey**

**Officers: Sgt. Girouard, Sgt. Maher and Officer Doe**

823.     Plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein.

824.     The conduct of the Defendants named in this count constituted intentional infliction of emotional distress.

825.    By their actions, Defendants subjected Demanbey to reprehensible conduct knowingly, intentionally, willfully, purposely, maliciously and with such reckless disregard of the consequences as to display a conscious indifference to the danger of harm and injury.

826.    As a direct result of the intentional conduct of the defendants in this count, Demanbey suffered severe emotional distress and great pain of body and mind.

## COUNT XXIX

### Intentional Infliction of Emotional Distress: Drapeau

### Officers: Green and Doe

827.    Plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein.

828.    The conduct of the Defendants named in this count constituted intentional infliction of emotional distress.

829.    By their actions, Defendants subjected Drapeau to reprehensible conduct knowingly, intentionally, willfully, purposely, maliciously and with such reckless disregard of the consequences as to display a conscious indifference to the danger of harm and injury.

830.    As a direct result of the intentional conduct of the defendants in this count, Drapeau suffered severe emotional distress and great pain of body and mind.

## COUNT XXX

### Intentional Infliction of Emotional Distress: Barrera

### Officers: Piskator and Doe

831.    Plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein.

832.    The conduct of the Defendants named in this count constituted intentional infliction of emotional distress.

833.    By their actions, Defendants subjected Barrera to reprehensible conduct knowingly, intentionally, willfully, purposely, maliciously and with such reckless disregard of the consequences as to display a conscious indifference to the danger of harm and injury.

834.    As a direct result of the intentional conduct of the defendants in this count, Barrera suffered severe emotional distress and great pain of body and mind.

## COUNT XXXI

**Intentional Infliction of Emotional Distress: Marcotte**

**Officers: Sgt. Maher and Officer Doe**

835.    Plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein.

836.    The conduct of the Defendants named in this count constituted intentional infliction of emotional distress.

837.    By their actions, Defendants subjected Marcotte to reprehensible conduct knowingly, intentionally, willfully, purposely, maliciously and with such reckless disregard of the consequences as to display a conscious indifference to the danger of harm and injury.

838.    As a direct result of the intentional conduct of the defendants in this count, Marcotte suffered severe emotional distress and great pain of body and mind.

## COUNT XXXII

**Intentional Infliction of Emotional Distress: Cummings**

**Officers: Sgt. Maher, Sgt. Watkins and Officer Doe**

839.    Plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein.

840.    The conduct of the Defendants named in this count constituted intentional infliction of emotional distress.

841.    By their actions, Defendants subjected Cummings to reprehensible conduct knowingly, intentionally, willfully, purposely, maliciously and with such reckless disregard of the consequences as to display a conscious indifference to the danger of harm and injury.

842.    As a direct result of the intentional conduct of the defendants in this count, Cummings suffered severe emotional distress and great pain of body and mind.

## COUNT XXXIII

**Intentional Infliction of Emotional Distress: Veronica Euga**

**Officers: LaFleche and Doe**

843.    Plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein.

844.    The conduct of the Defendants named in this count constituted intentional infliction of emotional distress.

845.    By their actions, Defendants subjected Veronica Euga to reprehensible conduct knowingly, intentionally, willfully, purposely, maliciously and with such reckless disregard of the consequences as to display a conscious indifference to the danger of harm and injury.

846.    As a direct result of the intentional conduct of the defendants in this count, Veronica Euga suffered severe emotional distress and great pain of body and mind

## COUNT XXXIV

### Intentional Infliction of Emotional Distress: Christopher Euga

### Officers: Sgt. Lopopolo and Officer Doe

847.    Plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein.

848.    The conduct of the Defendants named in this count constituted intentional infliction of emotional distress.

849.    By their actions, Defendants subjected Christopher Euga to reprehensible conduct knowingly, intentionally, willfully, purposely, maliciously and with such reckless disregard of the consequences as to display a conscious indifference to the danger of harm and injury.

850.    As a direct result of the intentional conduct of the defendants in this count, Christopher Euga suffered severe emotional distress and great pain of body and mind.

## COUNT XXXV

### Intentional Infliction of Emotional Distress: Bishop

### Officers: Officer Does

851.    Plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein.

852.    The conduct of the Defendants named in this count constituted intentional infliction of emotional distress.

853.    By their actions, Defendants subjected Bishop to reprehensible conduct knowingly, intentionally, willfully, purposely, maliciously and with such reckless disregard of the consequences as to display a conscious indifference to the danger of harm and injury.

854.    As a direct result of the intentional conduct of the defendants in this count, Bishop

suffered severe emotional distress and great pain of body and mind.

## COUNT XXXVI

### Conspiracy (State civil conspiracy and federal civil conspiracy under 42 U.S.C. § 1983) Amarat

### Defendants Officers Frigon, Coleman and Tivnan

855.     Each of the foregoing paragraphs is incorporated as if fully set forth herein.

856.     Defendants tacitly or explicitly, conspired to use excessive force against Amarat, and subsequently conspired to concoct and report a false story regarding the circumstances of the arrest and the unreasonable amount of force that they used to arrest him.

857.     Their purpose was to physically assault and batter Amarat and to criminally prosecute him without legal cause and to conceal evidence of their violations of his constitutional rights and deny him due process.

858.     As a direct and proximate result thereof, Plaintiff suffered damages as set forth herein.

## COUNT XXXVII

### Conspiracy (State civil conspiracy and federal civil conspiracy under 42 U.S.C. § 1983) Crum

### Defendants Officers Green and Does

859.     Each of the foregoing paragraphs is incorporated as if fully set forth herein.

860.     Defendants tacitly or explicitly, conspired to use excessive force against Crum, and subsequently conspired to concoct and report a false story regarding the circumstances of the arrest and the unreasonable amount of force that they used to arrest her.

861.     Their purpose was to physically assault and batter Crum and to criminally prosecute her without legal cause and to conceal evidence of their violations of his constitutional rights and deny her due process.

862.     As a direct and proximate result thereof, Plaintiff suffered damages as set forth herein.

## COUNT XXXVIII

**Conspiracy (State civil conspiracy and federal civil conspiracy under 42 U.S.C. § 1983) Demanbey**

### Defendants Sgt. Girouard, Sgt. Maher & Officer Does

863.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

864.    Defendants tacitly or explicitly, conspired to use excessive force against Demanbey, and subsequently conspired to concoct and report a false story regarding the circumstances of the arrest and the unreasonable amount of force that they used to arrest him.

865.    Their purpose was to physically assault and batter Demanbey and to criminally prosecute him without legal cause and to conceal evidence of their violations of his constitutional rights and deny him due process.

866.    As a direct and proximate result thereof, Plaintiff suffered damages as set forth herein.

## COUNT XXXIX

**Conspiracy (State civil conspiracy and federal civil conspiracy under 42 U.S.C. § 1983) Drapeau**

### Defendants: Officers Green and Does

867.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

868.    Defendants tacitly or explicitly, conspired to use excessive force against Drapeau, and subsequently conspired to concoct and report a false story regarding the circumstances of the arrest and the unreasonable amount of force that they used to arrest her.

869.    Their purpose was to physically assault and batter Drapeau and to criminally prosecute her without legal cause and to conceal evidence of their violations of his constitutional rights and deny her due process.

870.    As a direct and proximate result thereof, Plaintiff suffered damages as set forth herein.

## COUNT XL

## Conspiracy (State civil conspiracy and federal civil conspiracy under 42 U.S.C. § 1983) Barrera

### Defendants: Officers Piskator and Does

871.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

872.    Defendants tacitly or explicitly, conspired to use excessive force against Barrera, and subsequently conspired to concoct and report a false story regarding the circumstances of the arrest and the unreasonable amount of force that they used to arrest her.

873.    Their purpose was to physically assault and batter Barrera and to criminally prosecute him without legal cause and to conceal evidence of their violations of his constitutional rights and deny him due process.

874.    As a direct and proximate result thereof, Plaintiff suffered damages as set forth herein.

## COUNT XLI

## Conspiracy (State civil conspiracy and federal civil conspiracy under 42 U.S.C. § 1983) Marcotte

### Defendants: Sgt. Maher and Officer Does

875.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

876.    Defendants tacitly or explicitly, conspired to use excessive force against Marcotte, and subsequently conspired to concoct and report a false story regarding the circumstances of the arrest and the unreasonable amount of force that they used to arrest him.

877.    Their purpose was to physically assault and batter Marcotte and to criminally prosecute him without legal cause and to conceal evidence of their violations of his constitutional rights and deny him due process.

878.    As a direct and proximate result thereof, Plaintiff suffered damages as set forth herein

## COUNT XLII

### Conspiracy (State civil conspiracy and federal civil conspiracy under 42 U.S.C. § 1983)
### Cummings Defendants: Sgt. Maher, Sgt. Watkins, and Officer Doe

879.      Each of the foregoing paragraphs is incorporated as if fully set forth herein.

880.      Defendants tacitly or explicitly, conspired to use excessive force against Cummings, and subsequently conspired to concoct and report a false story regarding the circumstances of the arrest and the unreasonable amount of force that they used to arrest him.

881.      Their purpose was to physically assault and batter Marcotte and to criminally prosecute him without legal cause and to conceal evidence of their violations of his constitutional rights and deny him due process.

882.      As a direct and proximate result thereof, Plaintiff suffered damages as set forth herein

## COUNT XLII

### Conspiracy (State civil conspiracy and federal civil conspiracy under 42 U.S.C. § 1983)
### Veronica Euga

### Defendants: Officers LaFleche and Does

883.      Each of the foregoing paragraphs is incorporated as if fully set forth herein.

884.      Defendants tacitly or explicitly, conspired to use excessive force against Veronica Euga, and subsequently conspired to concoct and report a false story regarding the circumstances of the arrest and the unreasonable amount of force that they used to arrest her.

885.      Their purpose was to physically assault and batter Veronica Euga and to criminally prosecute her without legal cause and to conceal evidence of their violations of his constitutional rights and deny her due process.

886.      As a direct and proximate result thereof, Plaintiff suffered damages as set forth herein.

## COUNT XLIV

### Massachusetts Civil Rights Act, M.G.L. c. 12, § 11I, Against Defendants Officer Frigon, Tivnan & Coleman, Kubiak, Piskator, LaFleche, Green, Sgt. Girouard, Sgt. Lopopolo, Sgt. Maher, Lt. Doherty, Chao, Sgt. Watkins and John Doe's

887.    As each of the foregoing paragraphs is incorporated as if fully set forth herein.

888.    Defendants, acting in concert arrested Plaintiffs.

889.    Defendants deprived all Plaintiffs of their well established rights to freedom of speech under the First Amendment to the United States Constitution and the Massachusetts Declaration of Rights, and to freedom from arrest without probable cause under the Fourth Amendment to the United States Constitution as applied under the Fourteenth Amendment and our Declaration of Rights.

890.    As a direct and proximate result of Defendants' actions, Plaintiff suffered the damages described above.

## **DEMANDS FOR RELIEF**

The Plaintiff hereby respectfully requests the following relief:

1. All compensatory damages recoverable;
2. Injunctive relief;
3. All punitive damages recoverable;
4. All attorney's fees, costs, and expenses allowable;
5. Joint and severally liability as to all defendants;
6. Strict liability against the owner and handler of the dog for the injuries caused;
7. All remedies available according to the law of damages for the plaintiff;
8. Any and all other relief as the Court deems just and proper.

## **PLAINTIFF DEMANDS A JURY TRIAL AS TO ALL COUNTS IN THE COMPLAINT**

Respectfully submitted,

Plaintiffs, JAVIER AMARAT, VERONICA
EUGA, CHRISTOPHER EUGA,
MAX MARCOTTE,
RICHARD P. CUMMINGS,
OLYVIA CRUM, SARAH DRAPEAU,
ANTONIO BARRERA,
LINDSAY DEMANBEY, SAM BISHOP,
ANTONIO BARRERAS

By their attorneys,

*/s/ Hector E. Pineiro*
Hector E. Pineiro, BBO # 555315
Robert A. Scott BBO # 648740
Law Office of Hector E. Pineiro, P.C.
807 Main Street
Worcester, MA 01610
Tel. (508) 770-0600
hector@pineirolegal.com
robin@pineirolegal.com

*/s/ Joseph F. Hennessey*
Joseph F. Hennessey, Esq.  BBO#669552
Law Offices of Joseph F. Hennessey
807 Main Street
Worcester, MA 01610
Tel: 508 881-9500

DATED: June 1, 2023                  j@hennesseylaw.net